Eula JACKSON, Administratrix of the
Estate of John Wallace Jackson,
Deceased

v.

**BALDWIN–LIMA–HAMILTON
CORPORATION.**

Robert C. BURT

v.

**BALDWIN–LIMA–HAMILTON
CORPORATION.**

Civ. A. Nos. 30030, 30201.

Untied States District Court
E. D. Pennsylvania.

March 31, 1966.

Richter, Lord & Cavanaugh, B. Nathaniel Richter, Philadelphia, Pa., and McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for plaintiffs.

Michael A. Foley, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

These actions, which were tried together, arise from an accident which occurred at Crossett, Arkansas on November 21, 1960, when the 50 foot boom of a crane, then operated by an employee of the Crossett Paper Company (Crossett), fell upon Jackson and Burt, causing the former's death and the latter's injuries.

The crane was manufactured by the defendant, Baldwin-Lima-Hamilton Corporation (Baldwin), and sold through its dealer, the Southern Tractor and Equipment Company (Southern), of Monroe, Louisiana to Crossett in June, 1959. Crossett used the crane regularly in its business without mishap for about seventeen months before the tragic event.

The first trial was had before one of our colleagues and a jury for there weeks in May, 1965. The cases were submitted

to the jury for general verdicts, but the jury, unable to agree, was discharged.

The second trial began on September 20, 1965, and terminated eight days later in a judgment for the defendant in each case, when the jury, by negative answers to special interrogatories 1(a) and 2(a),[1] found no negligence or breach of warranty on the part of Baldwin. The actions were tried under the prevailing law of Arkansas.

The plaintiffs' complaints claim negligence and breach of warranty by Baldwin in the manufacture and design of the crane. Early in the trial we advised counsel of our intention to submit the issues to the jury in the posture of specific interrogatories. Copies of the interrogatories proposed were given to all counsel well in advance of the conclusion of the evidence. Counsel neither objected to their use nor offered any suggestion of amendment or supplement thereto.

After *the entry of judgments* for the defendant on October 1, 1965 the plaintiffs filed:

(1) on October 4, a motion to enlarge the record to include plaintiffs' points and supplemental points for charge.

(2) on October 8, an alternative motion (a) for new trial, or (b) for a directed verdict, assigning 24 reasons.

(3) on October 20, 18 additional reasons assigned in support of the alternative motion.

■ Despite the incorrect designation, we treat the plaintiffs' "motion for a directed verdict" as a motion for judgment notwithstanding the verdict. So treated, we must deny the motion, because of plaintiffs' utter disregard of the plain provisions of F.R.Civ.P. 50(a) and (b). Plaintiffs' counsel filed no motion for a directed verdict at the close of all the evidence. The omission of that prerequisite is fatal to that aspect of plaintiffs' motion. Massaro v. United States Lines, 307 F.2d 299 (3 Cir. 1962); Brandon v. Yale & Towne Mfg. Co., 220 F.Supp. 855 (E.D.Pa. 1963) aff'd. per curiam 342 F.2d 519 (3 Cir. 1965).

■ The plaintiffs' motion to enlarge the record to include their points and supplemental points for charge will be denied. The events preceding the surprising failure of the plaintiffs timely to file or even proffer written requests for instructions are delineated in our Findings of Fact[2] filed of record on October 7, 1965. For present purposes it is sufficient to allude to them briefly.

The sudden and unexpected death of our esteemed law clerk of many years necessitated our absence to attend his funeral services on the afternoon of September 30, 1965. All counsel had been privately so advised before the closing arguments to the jury, which were completed at 11:30 A.M. on that day.

Only after we had recessed trial until the following day at 10:00 A.M., had excused the jury and were leaving the bench did plaintiffs' counsel inquire whether the trial judge had the plaintiffs' points for charge. We informed counsel that no points had been filed or submitted for our consideration. Thereupon, plaintiffs' counsel hastily procured from an associate and proffered certain papers, stating that they were his points for charge.

We declined to consider the papers then offered as written requests because they were not timely filed at the close of the evidence, as required by F.R.Civ.P. 51. No written requests or supplemental requests for charge were presented to the trial judge or the clerk on Friday, October 1, 1965.

In the circumstances in which the purported requests were proffered the trial judge could not, as required by the rule, "inform counsel of its proposed action upon the requests prior to their arguments

---

1. Special Interrogatories submitted to the jury were, in part, as follows:

    1(a) Was the defendant, Baldwin-Lima-Hamilton Corporation negligent?

    2(a) Did the defendant, Baldwin-Lima-Hamilton Corporation breach any warranty, expressed or implied, from the defendant to Crossett Company, the employer of Jackson and Burt?

2. Document No. 44 in C.A. 30030.

to the jury," because the arguments had been concluded.

Plaintiffs made no objection to the trial judge's failure to give the instructions purportedly contained in the requests before the jury retired to consider its verdict; nor was any motion made to have such papers filed or made a part of the record on Friday, October 1, 1965.

■ When counsel omits to make timely requests for charge and omits, as well, to object to the failure of the trial judge so to instruct, the failure to instruct may not be assigned as error. F.R. Civ.P. 51; Stueber v. Admiral Corp., 171 F.2d 777 (7 Cir. 1949) cert. denied 336 U.S. 961, 69 S.Ct. 891, 93 L.Ed. 1113 (1949); Bercut v. Park Benziger & Co., 150 F.2d 731 (9 Cir. 1945); Burch v. Reading Co., 140 F.Supp. 136 (E.D.Pa. 1956) aff'd. 240 F.2d 574 (3 Cir. 1957); cert. denied 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957).

Since no error may properly be assigned on appeal in this regard, we think it needless to encumber this record further by the inclusion of the points and supplemental points for charge now tendered by plaintiffs' motion to enlarge the record. Arnold v. Loose, 352 F.2d 959, Opinion filed October 19, 1965 (3 Cir. 1965).

The plaintiffs' motion for a new trial, as filed, assigns twenty four grounds of asserted error on the part of the trial judge. Of the twenty four only three were preserved by timely objections made by plaintiffs' counsel to the charge of the Court. They are: (1) the trial judge erred when he told the jury that representations made after the sale cannot be considered as warranties; (2) that such representations allegedly made by a service representative of Baldwin could only be considered as negligent mispresentations and not as an oral warranty; (3) failure of the Court to instruct the jury that Crossett's concurrent negligence would not exculpate Baldwin.

Summarizing the remaining grounds which were not preserved by exceptions to the charge, plaintiffs allege that funda-mental error was committed by the Court in that: (1) the trial judge failed to charge on the doctrine of independent intervening agency and superseding cause; (2) the trial judge instructed the jury that the test of negligence is a "foresight" not a "hindsight" test; (3) the charge on foreseeability was incomplete; (4) absolute liability should have been the standard of care required by Baldwin instead of ordinary care; (5) the trial judge was in error in *suggesting* to the jury that it could consider or decide the question of proximate cause before it resolved the issue of negligence; (6) error resulted from the charge of the Court on the duty of the jury not to be influenced by sympathy. The plaintiffs have alleged many other points which relate to, restate and expand upon the grounds outlined above.

The plaintiffs, as well, generally attack the verdict as contrary to the evidence, the weight of the evidence, the law and, for whatever it may be worth, the weight of the law. Finally, they object to the use of interrogatories by the Court, claiming now that the interrogatories were not related to the law and the facts.

Upon careful review we conclude that all of the reasons assigned by plaintiffs in support of their motions for a new trial are devoid of merit, except that which asserts that the verdict on the issue of defendant's negligence is against the weight of the evidence.

■ Additionally, the plaintiffs filed, abortively, eighteen additional reasons, ineptly titled "Supplemental Points", for a new trial, on October 20, 1965 after the ten day period prescribed by Rule 59 had expired. Because of the plaintiffs' flagrant disregard of the time limitation of Rule 59 we have no jurisdiction to consider their "Supplemental Points" (Document No. 35) and direct the Clerk to strike this paper from the record. Marks v. Philadelphia Wholesale Drug Company, 222 F.2d 545 (3 Cir. 1955); Schuyler v. United Air Lines, 94 F.Supp. 472, 477 (M.D.Pa. 1950) aff'd. per curiam 188 F.2d 968 (3 Cir. 1951); Levin v. Trans

World Airlines, Inc., 201 F.Supp. 791 (M.D.Pa. 1962) Rules 59(b) and 6(b).

## BREACH OF WARRANTY

Early in 1959, Crossett, by inquiries to three dealers in heavy machinery, evidenced interest in a prospective purchase of a crane. One of the dealers was Southern. After discussions with sales representatives of Southern and Baldwin, Crossett selected a specific crane from a Baldwin catalogue. During the negotiations Crossett was made aware that the particular crane it eventually selected was capable of performing several operations, including lifting and digging with a shovel attachment. Crossett advised Baldwin that it needed a crane only for lifting and hoisting loads.

The crane selected by Crossett from the Baldwin catalogue was a type 24–W crane, mounted on rubber wheels. Detailed specifications were submitted to Southern by Crossett and Southern prepared and transmitted its detailed order, pursuant to these specifications, to the Baldwin factory in Lima, Ohio (Exhibit D–3). The order provided that the crane was to be shipped F.O.B., from Lima, Ohio to Southern, c/o Crossett Paper Mill, Crossett, Arkansas.

Upon its arrival in June, 1959 on a railroad flat car the crane was unloaded, assembled for operation and tracked into the Crossett mill under the supervision of T. C. Hembree, Sr., of Southern. Mr. Hembree explained the operation and maintenance of the crane to various personnel of Crossett. When the crane arrived, its locked cab was opened with a key delivered by Southern to Crossett. Inside the cab was a pamphlet entitled "Operator's Manual—Lima-Shovel Crane, Clamshell, Dragline and Pull Shovel— Type 24." (Exhibit P–5).

Mr. Hembree discussed certain of the contents of the manual with some of Crossett's personnel and advised them to familiarize themselves thoroughly with its contents. Mr. Wiggins, who was a Crossett employee in charge of its heavy machinery, read the entire manual to acquire understanding of the operation of the machine. Hembree made approximately six trips to Crossett during a 30 day period after delivery to explain further the operation and maintenance of the machine to Crossett employees and officials.

On one of these visits to Crossett, Hembree tightened the springs of a built-in device known as the crowd-retract lever to impede its operation. It was the operation of this device which gave rise to the claims involved in this litigation.

The crane has a side-stand control panel in the cab, opposite the operator's right arm, which regulates the shifting of the crane from a lifting operation (boom hoist) to a shovel operation (crowd-retract). These operations are controlled by a poppet valve known as lever number 3. Lever number 3 is an air and spring-operated mechanism, which physically resembles a spoon handle. It is about $\frac{1}{4}$ of an inch thick, flat in appearance, with a slightly rounded tip and protrudes from the panel about 1 inch.

When lever number 3 valve is in an upward position, the boom-hoist gear is engaged for lifting and its drum is locked. When lever number 3 is depressed downward, air is admitted to a cylinder ("F"), located beneath the floor plate of the cab, the brake is released and a portion of the clutch-shifter lever beneath the floorplate moves to the left on its pivot causing a spring (B) to compress, which actuates the movement of the jaw clutch on its spline shaft to the right approximately $\frac{3}{16}$ths of an inch before air is "dumped" out of another air cylinder (E) located beneath the floorplate of the cab, which in sequence releases a spring operated piston from inside the cylinder (E) that moves on a fulcrum attached to a safety ratchet or "dog" which is then locked into the flange of the boom-hoist drum to prevent the boom from falling when the jaw clutch is disconnected from the boom-

hoist to crowd-retract position.[3] See Exhibit P–12A.

The plaintiffs offered testimony by Mr. Wiggins that two or three days after the crane was delivered, a Mr. Schumpert, now deceased, of Baldwin came to Crossett and introduced himself as a service engineer. In support of this testimony the plaintiffs offered Page 5 Part No. 1 of the Operator's Manual (Ex. P–5) which states: "An experienced LIMA Service Engineer is usually present as soon as possible after the machine makes its destination."

Mr. Wiggins queried Mr. Schumpert on the function of the "crowd-retract" device and allegedly was told by Mr. Schumpert: "I am going to disconnect that particular part. You don't have to worry about it."

These statements attributed to Schumpert are claimed by the plaintiffs to create an express warranty that the "crowd-retract" and all its sequellae had been shut off by adjustments made by both Schumpert and Hembree underneath the crane shortly after its arrival. In this context the plaintiffs further contend that the quoted portions of the manual vested Schumpert with both implied and apparent authority to make the warranty claimed.

We instructed the jury that as a matter of law, the representation allegedly made by the agent of the defendant after the machine was sold and delivered could not be considered a warranty, because it was not a part of the contract and was not supported by a separate consideration. We did instruct the jury, however, that such a representation "can be negligence, if that representation was in fact untrue, and if the persons who heard it relied on it, then it might be negligence." (n. t. 793).

The plaintiffs further urge that we erred in charging the jury that delivery had been completed and that the latest time that representations could be considered as warranties was on the physical delivery of the crane. They contend that completion of delivery was postponed by the Operator's Manual Page 5, which represented that a Lima Service Engineer would arrive soon after delivery of the crane.

The Uniform Sales Act was in effect as the law of Arkansas at the time of the sale of the crane and at the time the injury occurred. An express warranty is defined in Vol. 6A Ark.Stat.Ann. § 68–1412 as follows:

*"Express warranty defined*

*Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is* to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. *No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."* (emphasis ours)

■ Whether the statements were *ever* made was, of course, a preliminary question of fact for the jury, even though the testimony was not contradicted. Exner v. Safeco Ins. Co. of America, 402 Pa. 473, 477, 167 A.2d 703 (1961).[4] However, even if made, the oral statements attributed to Schumpert had no tendency to induce Crossett to purchase the crane in question.

There was no evidence that Crossett ever informed any representative of Baldwin, after delivery of the crane, that it wanted to exercise its right to return the crane, or that Crossett forewent such

3. In addition to this automatic activation of the safety ratchet, another poppet valve located to the right of lever number 3 known as the "Independent Boom Hoist Ratchet" could be utilized simply to dump the air out of cylinder (E) to lock the ratchet into the boom hoist drum when extra heavy loads were being lifted by the boom. This manual operation did not cause any of the sequential systems of the crowd-retract device to be activated.

4. The law of the forum controls all questions such as the sufficiency of evidence and the burden of proof.

right because of any representations made by agents of Baldwin subsequent to delivery of the machine. The plaintiffs argued this point in objecting to a portion of our charge, but they did not then, nor do they now, point to *any* evidence which would support such findings.

■ It is the general rule that a contract of warranty requires consideration. If it comes into existence at the time of the sale it is supported by the consideration of the sale, but if it is given *after* the contract of sale is completed, it must be accompanied by a new and separate consideration. 77 C.J.S. Sales § 306. It is also rather generally held that " * * * courts are not inclined to construe as warranties affirmations by the seller made after the agreement for the sale, *even though made before the article is delivered and the price paid.*" 46 Am.Jur. Sales § 300.

■■ Under Arkansas law, the plaintiff has the burden of proof to establish by the preponderance of the evidence *both* the existence and breach of an express warranty. Delta Oxygen v. Scott, 238 Ark. 534, 383 S.W.2d 885 (1964).[5] It is also the law of Arkansas that the plaintiff, in order to establish an oral express warranty, must prove, " * * * that it was reasonable, proper, and essential *in the sale* of the goods with which he (salesman) was intrusted; that the same was in no way beyond the usage of the business; and that he was clothed with ostensible authority to make the express warranty claimed by plaintiff to have been made." Hercules Powder Co. ·v. Rich, 3 F.2d 12, 17 (8 Cir. 1924).

■ Nothing in the manual could have induced Crossett to purchase this machine, since the manual was not seen until after the cab of the crane was un-

locked after delivery; nor could the quoted portion on page 5, on which plaintiffs strongly rely, have created any implied or apparent authority on the part of Schumpert.

"As a general rule, it is not within the implied or apparent authority of an ordinary salesman in selling a machine or installed unit to make a warranty of the efficiency or safety of some apparatus in conjunction with which the article sold is to be used." 40 A.L.R. 2d § 6 p. 306.

*The general custom or usage of trade* determines whether salesmen can warrant other than is implied in law. 40 A.L.R.2d § 3 p. 292.[6] The plaintiffs offered no evidence whatever of any trade custom or usage in the heavy machinery industry, which would remotely tend to indicate that salesmen or service representatives have any authority to warrant the safety of an apparatus.

■ Fatal to the plaintiffs' claim of apparent or implied authority on the part of Schumpert is the very Operator's Manual (Ex. P–5) upon which they place great reliance. Mr. Wiggins testified that he read the "entire book" after delivery (n. t. p. 69). On page 714, part no. 7 of the Operator's Manual is contained a specific disavowal by Baldwin of any authority on the part of any person, except *one*, to vary or extend any warranties regarding the crane. It reads, in pertinent part:

"This warranty is given in lieu of all expressed or implied warranties and other obligations of the Company *and may not be varied or extended by any person agent or representative of the Company unless expressly authorized in writing by the Vice President in Charge of the Construction Equipment Division of the Company.*"

---

5. This case also eliminated the requirement of privity of contract in breach of warranty cases under Arkansas law.

6. "The rule followed by most of the courts is, in substance, that the authority to sell a particular kind of article of personal property includes the authority to warrant the title, quality or condition of the

thing sold *if, and only if,* such warranty is usual or customary in such a transaction and is reasonably necessary to transact the business of making the sale which has been entrusted to the agent." 3 Am.Jur.2d Agency § 111. (emphasis supplied)

Such an express limitation or disavowal of the authority of Baldwin's representatives, except as noted, negated plaintiffs' unsupported claim that Schumpert had authority to extend to Crossett an oral warranty in the form of his alleged representation. 40 A.L.R.2d §§ 13–14 pp. 316–321. Mr. Wiggins having read the "entire book" either knew this limitation or *should have known it.* 3 Am.Jur.2d Agency § 116. His purported reliance on the statement of Schumpert or of any other person, such as Hembree, was unavailing to create an express oral warranty.

■ Upon the question of completion of delivery, the Supreme Court of Arkansas has held that where goods are sold by non-resident manufacturers and such goods are delivered "F. O. B." to carrier (as per the terms of the Machinery Purchase Order in this case Ex. D–3) for transportation to Arkansas buyers, *delivery to the carrier at the place of shipment constitutes delivery to the buyer.* McLeod v. J. E. Dilworth Co., 205 Ark. 780, 171 S.W.2d 62, 65 (1943) aff'd 322 U.S. 327, 64 S.Ct. 1023, 88 L. Ed. 430 (1944). The order in this case was received by Southern (Monroe, Louisiana) and forwarded to Baldwin (Lima, Ohio) for completion and shipment "F. O. B. Lima, Ohio" to Southern at Crossett, Arkansas. Under the terms of the present contract and Arkansas law the "sale" was completed when the goods were delivered to the carrier at Lima, Ohio.

■ That the Sales Act § 68–1447 gives the buyer a right of examination upon delivery of the goods does not postpone the time for consummation of the sale. When the crane was shipped from Lima, Ohio, a conditional title passed to Crossett, subject to its right to rescind the sale. The Sales Act and the law of Arkansas are to the effect that a buyer is deemed to have accepted goods when, after delivery, the buyer does *any* act in relation to them which is inconsistent with ownership of the seller. § 68–1448 of the Sales Act and see Johnson v. Faucett, 214 Ark. 684, 217 S.W.2d 616 (1949).

■ Under the undisputed facts and evidence in this case, we think an acceptance by Crossett occurred when the crane, after unloading and assembly, was tracked into the warehouse of Crossett, demonstrating an exercise by Crossett of a control over the crane inconsistent with the ownership of Baldwin. Moreover, the continued retention and use of the crane by Crossett, without the slightest intimation to Baldwin that it rejected the machine, conclusively establishes acceptance by Crossett.

Plaintiffs do not attack that portion of our charge which instructed the jury that, as a matter of law, there was an *implied warranty* of fitness for the purpose for which the crane had been sold; nor do the plaintiffs challenge our charge on the issue of whether an *express warranty* arose during the negotiations between Crossett and the defendant's agent *preceding* the sale. On this score, we left to the jury to determine whether a representative or agent of Baldwin to induce the purchase of the crane had assured Crossett that the boom would never fall.

■ Under all the evidence, we conclude that the jury's negative answer to Interrogatory 2(a) finding that there was no breach by Baldwin of any warranty, was just, fair and proper and had adequate evidential basis.

## NEGLIGENCE

■ We turn now to plaintiff's claim that the jury's negative answer to Interrogatory 1(a), finding that Baldwin was not negligent, was against the weight of the evidence. This motion is addressed to our discretion and we may set aside the finding as against the preponderance of the evidence, though judgment notwithstanding the verdict is not justified. 6 Moore's Federal Practice ¶ 59.08[5] p. 3817 2d ed. 1953). See Montgomery Ward Co. v. Duncan (Ark.), 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

■ At the outset we recognize that, in ruling on a motion for a new trial on this ground, our discretion must be exercised in accordance with ascertainable

legal standards and must not usurp the function of the jury. Fassbinder v. Pennsylvania Railroad Company, 322 F.2d 859 (3 Cir. 1963). "In the exercise of that discretion, the Court may consider the evidence as a whole and weigh it, and if he thinks the jury was mistaken or that the verdict is wrong, although supported by some evidence, he should grant a new trial." Wilson v. Nu Car Carriers, 158 F.Supp. 127 (M.D.Pa. 1958); Gaynor v. Atlantic Greyhound Corp., 86 F.Supp. 284 (E.D.Pa. 1949).

"It is sometimes said that on a motion for a new trial the court must consider the evidence in the light most favorable to the party who obtained the verdict. (cases cited)

"Such expressions confuse the motion for a new trial with the motion for judgment notwithstanding the verdict. The correct rule is that on a motion for a new trial the judge is not bound by conflicts in the evidence but sits as a thirteenth juror, (cases cited), and that he may not properly deny the motion solely because there was sufficient evidence in support of the prevailing party to require the submission of the issue to the jury, (cases cited). Instead he may grant a new trial if he thinks the verdict wrong even though supported by some evidence." (cases cited) Barron and Holtzoff, Fed. Prac. Proc. Vol. 3 § 1304 Rule 59 p. 361 (Rules ed. 1958).

■ It is our carefully considered opinion that the jury's finding that Baldwin was not negligent is contrary to the *weight of the evidence* and that justice requires a partial new trial on the negligence issues of the plaintiffs' claims. See Indamer Corporation v. Crandon, 217 F.2d 391 (5 Cir. 1954).

We instructed the jury that "the manufacturer in these circumstances, too, has a duty to give reasonable and adequate instructions with respect to conditions and methods of safe use of its product when danger is reasonably foreseeable in its use." (n. t. 782).

Baldwin's defense to plaintiffs' negligence claims is primarily predicated on the failure of Crossett to lubricate the "safety ratchet" for 17 months preceding the accident, which failure, Baldwin asserts, caused it to become salt-caked and frozen with rust, making its operation impossible.

Q "Why didn't it work?"

A. "The reason that it did not work is due to no lubrication on the pin, and since the parts are made of steel with no lubrication in humid conditions, where there is moisture and such as that, rust can develop very quickly and it froze." (n. t. p. 678)

It cannot be denied that this "safety ratchet" was an important device in the operation of the crane, for when the jaw clutch was disconnected from "boom hoist" to "crowd-retract" the "safety ratchet" was the only mechanism to prevent the 50 foot boom from falling. The defendant's operator's manual page 514, part no. 5 (Ex. P–13) states in part:

"Thus when the clutch shifter valve in the side stand is positioned for crowd retract, the brake and friction clutch are disengaged from the boom hoist drum *and the boom hoist drum is locked with the safety ratchet.*" (emphasis supplied)

The cab of the machine contains a lubrication chart, furnished by defendant, which was affixed to the wall. (Ex. P–15) No mention of any necessity for lubrication of this important "safety ratchet" appears on this lubrication chart, despite the danger inherent in its failure to function for want of proper lubrication. The court portends to be the "guide for the proper lubrication of this machine." (Ex. P–15)

Additional importance is given to the lubrication chart by page 6 part no. 1 of the manual (Ex. P–17), which reads:

"TO PROLONG THE EFFICIENCY OF THE MACHINE"

"2. Lubricate as per instructions posted in cab of machine."

Crossett, in apparent reliance on these instructions, did not lubricate the "safety

ratchet" for 17 months preceding the accident.

"A. Well, we naturally followed the suggestions by the manufacturer as they printed them on the lubrication chart. We followed those and we didn't go around with a flashlight and a spyglass searching for other points that were not mentioned on the lubrication chart. So, naturally, we assume that they covered the entire field as to the lubrication." (n. t. p. 225)

When the machine arrived Wiggins was not familiar with the crowd-retract device, which includes in its sequellae the "safety ratchet". There is no evidence that any *specific or supplemental* instructions were given to Crossett's personnel to lubricate the "safety ratchet", which was not a readily accessible mechanism, located some 21 inches beneath the floor of the cab. Only the top part was visible at floor level and the remainder could only be seen or serviced through a hole three-eighths of an inch wider than the ratchet itself.

█ Under these circumstances we think a probable consequence, reasonably foreseeable by Baldwin, was that Crossett would rely on the lubrication chart, which Baldwin represented to be "a guide to proper lubrication", and so, would fail to lubricate the "safety ratchet", which was not mentioned on the chart. In our view it is only reasonable to expect that a manufacturer, who undertakes to equip its machines with safety devices to protect human life, will exercise the quantum of care required under the circumstances to instruct the buyer how to maintain such safety devices properly in light of the danger reasonably inherent in the normal use of the machine.

It is of little moment that it may have been the normal custom in the Baldwin plant or in heavy machinery industry to lubricate parts not set forth on lubrication charts. Such a custom, of which the buyer is or may be unaware, does not relieve a manufacturer of the duty to exercise ordinary care, which varies with the circumstances of each case. "It has been said that when a manufacturer undertakes by printed instructions to advise of the proper use to be made of his product, he assumes the responsibility of giving accurate and adequate instructions respecting the dangers inherent in its improper use." 78 A.L.R.2d § 3 Products Liability-Machinery Tools pp. 607, 608.

The efficient and safe operation of this crane in the event of intentional or accidental shift from "boom-hoist" to "crowd-retract" inherently depended on the proper operation of the "safety ratchet", and the intended "proper operation appears, in turn, to have depended on adequate interim lubrication. We think that the jury's essential finding, in this respect, that Baldwin's failure to provide adequate lubrication instructions for the safety ratchet was not negligence was contrary to the weight of the evidence, and that justice therefore, requires that plaintiffs' motion for new trial be granted, limited to the issues of negligence and damages arising from plaintiffs' claims.[7]

Since a third trial of these actions, in part, is now necessary, we suggest that counsel meanwhile avail themselves of any assistance afforded by the comprehensive charge and special interrogatories of Lemley, J., applying Arkansas law, in the products liability case of Walton v. Sherwin-Williams Company, 10 F.R.D. 293 (E.D.Ark. 1950) aff'd 191 F.2d 277 (8 Cir. 1951).

## ORDER

Now, this 31st day of March 1966, it is ordered that

(1) the plaintiffs' motions for judgment N.O.V. be and they are denied;

(2) the plaintiffs' motions to enlarge the record be and they are denied;

(3) the additional reasons, filed and docketed on October 20, 1965 as "Supple-

---

7. Our conclusion that the jury's finding in answer to interrogatory 1(a) is against the weight of the evidence renders un-

necessary disposition of other reasons assigned by plaintiffs which have not been previously ruled upon herein.

mental Points" shall be stricken from the record;

(4) the plaintiffs' motions for a new trial be and they are denied insofar as they relate to all issues arising from claims of breach of warranty by defendant;

(5) the plaintiffs' motions for a new trial be and they are granted insofar as they relate to all issues arising from claims of defendant's negligence;

(6) the judgments entered herein be and they are set aside;

(7) a new trial is granted to plaintiffs, limited, however, to the issues of negligence, causation and damages, all costs to abide final judgment unless otherwise hereafter ordered.