Kathy THOMAS, Plaintiff,

v.

**KAUFMANN'S, a Division of the May Department Stores Company, a corporation, Defendant.**

Civ. A. No. 76–41.

United States District Court,
W. D. Pennsylvania.

Aug. 19, 1977.

Leonard E. Price, Pittsburgh, Pa., for plaintiff.

Richard J. Mills, Meyer, Darragh, Buckler, Bebeneck & Eck, Pittsburgh, Pa., for defendant.

OPINION

SNYDER, District Judge.

The Defendant, The May Department Stores Company, has moved for judgment notwithstanding the verdict or for a new trial in this action for slander and false imprisonment[1] growing out of the actions of its security officers and other employees when the Plaintiff, an Assistant Manager in the Children's Wear Department, was asked to resign after being accused of stealing from the Defendant's Ford-Steuben Mall Kaufmann Store. The jury, after six days of trial, answered special interrogatories and awarded Miss Thomas $12,000.00 general and $20,000.00 punitive damages in the slander action, and $1,003.00 general and $10,000.00 punitive damages in the false imprisonment action.[2]

Since we find the verdict to be against the clear weight of the evidence and that

---

1. A libel count growing out of a report by Kaufmann's to the Ohio Bureau of Unemployment Services was dismissed by the Court at the close of the Plaintiff's case and no objection was taken to this dismissal.

2. The Special Interrogatories propounded to the jury read: "I.   SLANDER
    1. Did the Defendant make a defamatory statement about the Plaintiff to any third person?   Yes
    A. Was such statement made maliciously or with reckless disregard of the truth or falsity thereof?   Yes
    B. Was such statement made negligently?   _____
    IF YOUR ANSWER TO 1A OR 1B IS YES, PROCEED TO ANSWER QUESTION 2.
    2. Was the defamatory statement true?   No
    IF YOUR ANSWER TO 2 IS NO, PROCEED TO ANSWER QUESTION 3.
    3. Was the occasion of making the statement privileged?   No
    IF YOUR ANSWERS TO 2 AND 3 ARE NO, PROCEED TO ANSWER QUESTION 4.
    4. What damages do you award?  A. Nominal Damages — $_____   B. General Damages — $12,000.00     C. Special Damages — $_____
    ONLY IF YOUR ANSWER TO QUESTION 1A IS YES, PROCEED TO ANSWER QUESTION 5.
    5. What punitive damages, if any, do you wish to award?   $20,000.00
        II.   FALSE IMPRISONMENT
    1. Was the Plaintiff detained by the Defendant?   Yes
    IF YOUR ANSWER TO 1 IS YES, PROCEED TO ANSWER QUESTION 2.
    2. Was the detention of the Plaintiff unlawful?   Yes
    IF YOUR ANSWER TO QUESTIONS 1 AND 2 IS YES, PROCEED TO ANSWER QUESTION 3.
    3. What damages do you award?  A. Nominal Damages — $_____   B. General Damages — $1,003.00     C. Special Damages — $_____
    4. If the Defendant acted maliciously or oppressively and you awarded general or special damages, what punitive damages, if any, do you wish to award?   $10,000.00

the interests of justice require a new trial, it will be so ordered.

## I. THE EVIDENCE

Giving the Plaintiff the benefit of all favorable inferences, the jury could have found the following:

Miss Thomas began work at the store in January of 1974, stocking shelves even before it was opened. She worked regularly and received incremental increases. She was promoted in early 1975 to Assistant Manager in the Children's Wear Department and as such her duties were to control inventory (called "blue-pencil"), open and close the cash registers, mark items for special sales, and generally take charge of the Department, for the Manager in name had two departments and rarely was involved in this Department. She was also expected to act as a regular sales clerk.

Beginning in May of 1975, she became active in union organizing at the store and continued her activities until the time of her "resignation" by way of attending meetings and inducing other employees to sign authorization cards for union representation.

On November 8, 1975, about 4:30 P.M., she was suddenly asked to go to the Security Office and was there accused of violating company rules and of stealing from the store. The Security Officer read her a warning concerning her rights which read:

"You must understand your rights before you ask any question. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer."

She signed a "Consent to Speak" which included the statement that no promises or threats had been made to her and no pressure or coercion of any kind had been used against her. After a considerable interview, she signed a statement that:

"Today, Friday, November 28, 1975, I failed to record a sale, and I took the money and placed it on my person. I know what I did was wrong and dishonest and that I could be prosecuted in Criminal Court for my actions. My only explanation for what I did was that I was trying to get something for nothing. Prior to making this statement I was advised of my constitutional rights and have further acknowledged these rights by reading and signing a waiver and consent to speak statement. I have read the foregoing statement and it is true and correct to the best of my knowledge."

As will be discussed more in detail, Miss Thomas contended that this statement was, in fact, coerced as the Security Officer gave her the alternative of (1) signing the statement and resigning, or (2) leaving the store publicly in the custody of police officers. In any event, she returned to the store about two hours later with her irate father, mother, sister and boyfriend, Bob Harlan. In response to questions by the father, the Security Officer explained that Miss Thomas had been caught stealing from the company and violating the company rules and had admitted that she had. The father supported his daughter and the Security Officer denied relief with the result that this suit was filed.

On the afternoon of November 28, 1975, Honesty Shoppers from the Pittsburgh Store were sent to the Ford-Steuben Mall Store and within less than an hour reported three incidents involving Miss Thomas. The first involved a $3.12 purchase which Shopper Rose Pyrett said she had made, and which was observed by Shopper Shirley Hickey.[3] Miss Thomas denied receiving this money or putting it in her purse. We note

---

**3.** The general technique used by the Honesty Shoppers is to interrupt a purchase being made by another Shopper with a small cash purchase saying that no receipt is required and then the Shopper so interrupted observes what the Clerk does with the cash to make sure it is immediately and properly recorded.

there was much confusion created by the cross-examination of Shopper Hickey as to the color of the purse, the number of purses and whether she was in a position to see the purse down under a shelf.

The Shoppers consulted on this matter and a short time later Shopper Barbara Walsh interrupted a purchase being made by Shopper Pyrett and Pyrett observed Miss Thomas put $4.16 into a small jewelry box outside the cash register. Shopper Hickey said she then saw Miss Thomas pick up both the purse (containing the $3.12) and the jewelry box (containing the $4.16) and leave the floor with a sandy haired boy, apparently going on her coffee break. The Shoppers did not keep a surveillance on Miss Thomas, but went to the Security Office to speak with Mr. Wymar, and another "clip" was set up.

This time, Shopper Meeder interrupted a purchase being made by Shopper Hickey and gave Miss Thomas $5.20 for her purchase which Miss Thomas put on (not in) the cash register and then she went back to the stockroom. Shopper Hickey saw another clerk pick up the money and take it to Miss Thomas in the stockroom. This incident was reported to Security Officer Wymar who, after consultation with the Administrator of Security in the Pittsburgh Store, called Miss Thomas to the Security Office and a search was conducted. The $3.12 in marked money was found in her purse. Miss Thomas contended that she had gotten the three dollars in change from another clerk and she gave that clerk's name, but the Security Officer did not believe her and therefore did not talk to the other clerk.

## II. THE CONTENTIONS

The Plaintiff sought to establish that the whole affair was engineered to punish her for her union organizing activities and to bring about her discharge. She outlined her involvement with the union and a Beverly Campbell supported her in this testimony. Fernanda Dawson, another of the union organizers, testified that the company officials knew of Miss Thomas' union activi-

ties and that it had been necessary for her (Dawson) to file a complaint with the National Labor Relations Board about her discharge by the Defendant in order to bring about a settlement. Herbert Mannis, the Director of Organization for the union, told of Miss Thomas' activities and another employee, Garnet Woltjan, testified about being harassed by her department manager and the store manager to sign a document that she would not solicit on Kaufmann's premises. The Defendant denied that the Honesty Shoppers' investigation had any connection with anti-union activities or that the store was even aware that the Plaintiff was involved with the union.

## III. THE MOTION FOR JUDGMENT N.O.V.

The Defendant has maintained throughout the case that all communications made by any of its agents, servants or employees concerning the incident involving the Plaintiff were privileged and therefore did not represent actionable defamation.

There were two types of statements made. The first were those made by and between the agents, servants and employees of the Defendant in the process of their observations and thereafter in the interview of the Plaintiff herself. Initially, there were the conversations held by and between the Honesty Shoppers and then the communication of their findings to the Store's Security Manager. The Security Manager communicated these findings to his superior, the Assistant Administrator of Security at the Downtown Pittsburgh Store. Later, during the interview of the Plaintiff at the Mall Security Office, other employees became involved with communications to the Plaintiff. The other statements were made to Plaintiff's family.

■ We deem the law in this Circuit on the Motion for Judgment N.O.V. to have been clearly enunciated in *Lewin v. Metropolitan Life Insurance Co.*, 394 F.2d 608, 613 (3rd Cir. 1968), citing *Morris Brothers Lumber Co. v. Eakin*, 262 F.2d 259 (3rd Cir. 1959) as follows:

"In determining whether judgment n. o. v. should be awarded, the court should consider 'only the question of law as to whether when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorable to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.'"

Further, on the sufficiency of evidence, see *Silverii v. Kramer*, 314 F.2d 407, 409 (3rd Cir. 1963):

". . . if the evidence is of such character that reasonable men, in an impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury." [Citations omitted].

Under these tests it is clear that the Court in the instant case cannot grant judgment notwithstanding the verdict in favor of the Defendant, either on the issue of liability, or on the issue of damages.

The Defendant would have us apply the law of Ohio, for that is where the incident occurred. With this we find no fault. Under *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the law of the place or places where the cause or causes of action accrued governs the creation of substantive rights and the defenses thereto. *See Hartmann v. Time*, 166 F.2d 127 (3rd Cir. 1948) (an action against the publisher of Life Magazine accusing the plaintiff for involvement in Fascist activities). We will apply the law of Ohio.

■ In *McKenna v. Mansfield Lelan Hotel Company*, 55 Ohio App. 163, 9 N.E.2d 166 (1936), there was an action for defamation brought by a former employee when McKenna was accused by her manager of stealing from her employer. The Court held there that the communications between the agents, servants and employees of the employer, *when honestly made*, were to be privileged. Following that case, this Court charged that the communications by and between the agents, servants and employees were privileged providing that they were not made up out of "whole cloth" because of her union activities. This testimony went to whether or not the charges were honestly made. *See Fawcett v. G. C. Murphy & Company*, 46 Ohio St.2d 245, 253, 348 N.E.2d 144, 149 (1976) holding:

"A communication is privileged when it is *made in good faith* on a subject in which the speaker has an interest or duty to another with a corresponding interest or duty even though what is said may be slanderous and untrue". [Emphasis added]

There was thus not a total failure or lack of evidence on which a jury could come to the conclusion that it did, and the case was required to be submitted to the jury. There was also some evidence of damage resulting not only from the defamation itself, but from the total conduct of the Defendant in this case so that both the defamation and false imprisonment cases required determination by the jury.

■ This applies equally well to the incident which occurred when the Plaintiff's irate father, accompanied by her mother, sister and boyfriend, returned to the store. Upon arrival, the father demanded an explanation and the charge of violation of store rules and stealing was again made. There was very little dispute that all the statements made in the Security Office at this time were made as a result of the demands for explanations made by the Plaintiff's father. Again, unless the whole matter was fabricated, these statements would appear to be privileged, as was charged by the Court. But whether they were fabricated is a matter for submission to the jury. The Defendant admits that the privilege is a qualified one and can be lost if the Defendant acted maliciously. It contends that the only evidence from which it could even be inferred that the Defendant acted with malice toward the Plaintiff is that concerning the union organizing activities of the Plaintiff. This evidence, however, was sufficient to take the case to the jury and the Motion for Judgment N.O.V. must be denied.

## IV. THE MOTION FOR NEW TRIAL

Under Rule 59 of the Federal Rules of Civil Procedure, once a Motion for Judgment N. O. V. is denied, an alternative Motion for New Trial must be considered as if it had been made independently. *See Rogers v. Exxon Research and Engineering Company*, 404 F.Supp. 324 (D.N.J.1975). We are well aware of the distinction between a new trial motion based on a claim that the verdict was against the weight of the evidence and such a motion based on a claim of error or other defect during the trial which resulted, or may have resulted, in the jury receiving a distorted, incorrect, or incomplete view of the operative facts, or created a condition whereby the giving of a just verdict was rendered difficult or impossible. *Cf. Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (3rd Cir. 1960), *cert. denied* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

In *Lind, supra*, at page 89, our Circuit has said:

"Professor Moore states in this connection: '[S]ince the credibility of witnesses is peculiarly for the jury it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.'

Professor Moore's views are logical and persuasive and buttressed by some decisional authority. *See Werthan Bag Corp. v. Agnew*, 6 Cir., 1953, 202 F.2d 119, 122 (question of damages). In the same vein, *Schirra v. Delaware, L. & W. R. Co.*, D.C.M.D.Pa.1952, 103 F.Supp. 812, 820, holds that if 'there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion, and it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.' *Pelham v. Hendricks*, D.C.M.D.Pa.1955, 132 F.Supp. 774, 775, goes further, ruling that: 'The evidence and inferences reasonably deducible therefrom must be viewed in the light most favorable to the prevailing party, and the Court must assure that the jury followed the Court's instructions.' "

We find here, based on the evidence produced at trial, that the jury's verdict as to the Defendant's liability for defamation was against the weight of the evidence and that a new trial must be granted. *Gebhart v. Wilson Freight Forwarding*, 348 F.2d 129, 133 (3rd Cir. 1965); *Jackson v. Baldwin Lima-Hamilton Corporation*, 252 F.Supp. 529, 537 (E.D.Pa.), *cert. den.*, 385 U.S. 803, 87 S.Ct. 189, 17 L.Ed.2d 117 (1966).

The Court instructed the jury that if they believed that the charges made by the Honesty Shoppers and the entire incident of November 28, 1975 grew out of the Plaintiff's union activities, they then should determine if the Defendant was motivated by malice and, if so, the charges against the Plaintiff would not be privileged.

Again viewing the evidence in a light most favorable to the Plaintiff, the evidence would show that Fernanda Dawson had been a victim of harassment by the Defendant for her union activities. Garnet Woltjam, a seamstress in the Alteration Department, was also harassed because of her union activities. There was also evidence that the store executives knew that Miss Thomas had been engaged in union organizing, but there was no evidence that the Honesty Shoppers' investigation at the Ford-Steuben Mall Store was brought about because of, or had any connection with those activities. Counsel for the Plaintiff was able to create a great deal of doubt about the reports of the Honesty Shoppers because of their difficulty in explaining just how, when, and where the

reports were written. There was also confusion about the cash register printouts indicating in any way that the Plaintiff had stolen any money. Some confusion existed also with respect to what happened to the money, except the $3.12 marked money found in Miss Thomas' purse, and who the "sandy haired boy" was who she apparently met during her coffee break, but who could not be identified later.

We are not at this point prepared to say, as contended by the Defendant, that all the anti-union evidence should have been excluded. We are, however, prepared to say that we are left with the definite and firm conviction that a mistake has been made in the finding that the Defendant's actions, through its agents, servants, and employees, was maliciously motivated.

As to the matter of false imprisonment, the Plaintiff denied that she was free to leave at any time during the interrogation and the jury apparently found that she was afraid, physically or otherwise, to leave the Security Office. There was, however, little evidence from which the jury could infer that Miss Thomas signed the confession under such circumstances as to have been falsely imprisoned by the Defendant.

Again, the Court must state that it is left with the firm conviction that the verdict regarding the liability of the Defendant for the false imprisonment charge was against the weight of the credible evidence and a new trial must be granted.

The Court is also of the opinion that the awards made by the jury, as set forth previously herein, were excessive to the extent that the jury brought about a result that was "shocking, unfair and biased". See *Frankel v. Heym*, 466 F.2d 1226 (3rd Cir. 1972). We deem the appropriate test as being set forth in *Tann v. Service Distributors, Inc.*, 56 F.R.D. 593, 598 (E.D.Pa. 1972), *aff'd*, 481 F.2d 1399 (3rd Cir. 1973) as:

> "The jury's award indicates caprice or mistake or a clear abuse of its factfinding discretion by the clear influence of partiality, corruption, passion, prejudice, or a misconception of the law. The trial judge should be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff."

But in this case, the Court takes the view that the jury's award must have been, and shows to have been, clearly influenced by partiality, passion, prejudice, or a misconception of the law as given to it by the Court. We have found the answers to the interrogatories on liability and the size of the damage award as manifesting prejudice against the Defendant, or a misconception of the law and a new trial will be granted. *Tann v. Service Distributors, Inc., supra.*

An appropriate order will be entered.