**Conchita S. LEWIN, Executrix of the Estate of Sidney E. Lewin, Deceased, Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Appellee.**

No. 16285.

United States Court of Appeals Third Circuit.

Argued June 9, 1967.

Decided April 16, 1968.

Rehearing Denied May 14, 1968.

Richard B. Malis, Malis, Malis & Malis, Philadelphia, Pa., for appellant.

Arthur W. Leibold, Jr., Dechert, Price & Rhoads, Philadelphia, Pa. (Owen B. Rhoads, Philadelphia, Pa., on the brief), for appellee.

Before STALEY, Chief Judge, KALODNER, Circuit Judge, and SHERIDAN, District Judge.

## OPINION OF THE COURT

SHERIDAN, District Judge.

Sidney E. Lewin, a citizen of Pennsylvania, brought an action against the Metropolitan Life Insurance Company, a New York corporation with its principal place of business in New York City, to recover benefits under two accident insurance policies. A jury awarded him $33,700, the maximum benefits under the policies. The district court granted Metropolitan's motion for judgment n. o. v. and, in the alternative, its motion for a new trial. Lewin v. Metropolitan Life Ins. Co., E.D.Pa.1966, 257 F. Supp. 506. This appeal is from that order.[1]

The district court had jurisdiction under 28 U.S.C.A. § 1332. The substantive law of Pennsylvania applies.

Lewin was insured under two policies of accident insurance issued by Metropolitan in 1936 and 1945. The 1945 policy provided in pertinent part:

## "BENEFIT PROVISIONS

"If, while this policy is in force, the insured shall sustain bodily injuries caused directly and independently of all other causes by external, violent, and accidental means, and if such bodily injuries shall cause, directly and independently of all other causes, any of the results hereinafter enumerated and defined in the following Provisions 1 to 5, inclusive, the Company shall pay the amount therein specified for such result, subject to the terms and limitations of this policy, and to the exclusions specified under 'Risks Excluded' on page 2 hereof.

\* \* \* \* \* \*

"RISKS EXCLUDED

"This policy shall not cover, and no payment of any kind shall be made hereunder for any of the results enumerated and defined in Benefit Provisions 1 to 5, inclusive, which are caused directly or indirectly, wholly or partly, by

\* \* \* \* \* \*

"(f) Ptomaine or bacterial infection, excepting only septic infection of and through a visible wound caused, directly and independently of all other causes, by external, violent, and accidental means;"

The 1936 policy was similar in that it provided for payment for injuries "caused directly and independently of all other causes, by violent and accidental means," and excluded coverage for disabilities caused by disease germs excepting only septic infection "of and through a visible wound caused directly and independently of all other causes by violent and accidental means."

On June 7, 1960, Lewin, 64 years of age, was the head of a candy brokerage firm and was attending a candy convention at the Bellevue-Stratford Hotel in Philadelphia. At 5:30 o'clock in the afternoon, he went to the room of a guest of the hotel to shower and change clothes. While showering, he stepped on a ·sharp object which resulted in a wound on the bottom of his right foot. He applied a Mercurochrome Band-Aid, but sought no treatment until eleven days later when he called Dr. Asher Woldow who had been treating him since 1956 for diabetes mellitus and peripheral vascular disease associated with coronary artery disease (arteriosclerosis). Dr. Woldow found a massive infection, with the foot and leg swollen and inflamed to mid-calf and pus exuding from the undersurface of the foot from a large wound with necrotic tissue[2] underneath it. He

1. Sidney E. Lewin died after this appeal was taken. Conchita S. Lewin, Executrix of his estate, was substituted as plaintiff.

2. Dr. Woldow defined necrotic tissue to be " \* \* \* almost dead tissue. It is whitish, pusy looking, not fresh and red as you would see if you had cut yourself. This is a sort of a dirty greenish-white tissue \* \* \* destroyed \* \* \* by infection."

diagnosed the infection as a "toxic purulent septic infection"[3] which was so far advanced as to present a surgical problem. Dr. Woldow called in Dr. Stein, a surgeon, who after a period of conservative treatment, amputated several toes and finally amputated the right leg at mid-thigh. Lewin had a severe psychic disturbance resulting from the amputation which caused an acute depression and required treatment by a neurologist and psychiatrist. He was not able to return to work.

Lewin applied for benefits under the policies. If the provisions had been fulfilled, under the 1936 policy he would have received $2,500 for the loss of one foot and $25 per week up to a maximum of 262 weeks, and under the 1945 policy $5,000 for the loss of one foot and $75 per week up to a maximum of 262 weeks. Metropolitan denied coverage.

■ The district court granted the motion for judgment n. o. v. because Lewin "did not sustain his burden of producing sufficient evidence so that a reasonable jury could find that the wound was the sole cause of the damages. Specifically, plaintiff did not produce any evidence to show that the arteriosclerosis and diabetes mellitus which either singly or together created a reduced blood flow to the foot, did not cause the infection or result in a condition where the body was totally unable to prevent the spread of infection. There is no testimony that the infection did not progress or remain viable because of the total occlusion of the popliteal artery." The court's conclusion was based principally on a determination that Pennsylvania law made it plaintiff's burden to show not only that the loss was caused solely by external, violent and accidental means, but also to exclude as causative factors all pre-existing and substantial infirmities which may have combined with the accident to produce the loss. Appellant contends that the court erroneously placed on Lewin the burden to prove that it did

not come within the exclusions, which is an affirmative defense. Appellant also argues that even if this burden were on Lewin, there was sufficient evidence to meet it. We hold that the district court erred in both of these respects.

The district court relied primarily on O'Neill v. Metropolitan Life Ins Co., 1942, 345 Pa. 232, 26 A.2d 898. In that case the court held that the burden of proof in the first instance was upon a plaintiff to show that he did not come within the exclusions in the policy. The court noted, however, that the plaintiffs alleged they were not within the exclusions:

> "Furthermore, by their pleadings the plaintiffs assumed the burden of proof, as the quotation, supra, from the statement of claim shows. The affidavit of defense accepted the issue tendered by denying the plaintiffs' averments as to the insured's non-violation of law, etc."

The court rejected a previous case which indicated that the burden was on the insurance company:

> "What this court there said about burden of proof was dictum; it was said on an issue not raised and on a matter not involved. If the *defense* was 'affirmative in character' it was because the parties by *their pleadings* made it so; the parties *here* did otherwise, as is pointed out above * * *."

The court also cited authority for the proposition that " 'the burden is often on one who has a negative assertion to prove.' " and held that it was plaintiffs' burden to prove that the insured did *not* come within the risks excluded.

The Pennsylvania Supreme Court's next statement on the subject was in Frame v. Prudential Ins. Co. of America, 1948, 358 Pa. 103, 56 A.2d 76, which appears to have modified the rule in O'Neill to provide that the plaintiff has the burden to show that the exclusion does not apply only if the proof points

3. He defined this as "an overwhelming infection that has secondary effects on the general systemic body, on the body itself, rather than just a local affair."

to a specific pre-existing infirmity or condition. The court said:

" * * * [P]laintiff must show that the death was caused solely by external and accidental means, and if the proof points to a pre-existing infirmity or abnormality which may have been a contributing factor he must also produce evidence to exclude that possibility: * * *. It should be added, however, that the word 'possibility' in that connection is not to be taken in its absolute or literal sense, but rather as having the practical meaning which the law ordinarily ascribes to such abstract terms."

This rule was followed in later Pennsylvania decisions. McGarity v. New York Life Ins. Co., 1948, 359 Pa. 308, 59 A.2d 47; Dauphin Deposit Trust Co. v. Lumbermens Mutual Casualty Co., 1952, 171 Pa.Super. 86, 90 A.2d 349; Kubacki v. Metropolitan Life Ins. Co., 1960, 193 Pa.Super. 138, 164 A.2d 48.

Finally, in Brenneman v. St. Paul Fire & Marine Ins. Co., 1963, 411 Pa. 409, 192 A.2d 745, the court had before it a policy which provided for payment on proof of loss of life " 'resulting directly and independently of all other causes from accidental bodily injury * * * (excluding such loss) resulting from * * * bodily or mental infirmity or any kind of disease * * *.' " [4] The insured died of a head injury sustained in an automobile mishap. The insurance company claimed that the accident was the result of a dizzy spell caused by arteriosclerosis and hypertension and therefore that these pre-existing infirmities contributed to the cause of death. The lower court, in granting judgment n. o. v., held that "The burden was on plaintiff to prove that the car collision which caused the head injury resulted from some event constituting an 'accident,' and to exclude the inference that it resulted from dizziness or blackout caused by arteriosclerosis and high blood pressure." In reversing, the Supreme Court said:

"The plaintiff did indeed have the burden of proof to establish an accident, but he was not required, in doing so, to disprove possible inferences of dizziness or blackouts caused by arteriosclerosis and high blood pressure. After he proved a bona fide accident, with testimony that the violence resulting therefrom caused death, the burden shifted to the defendant insurance company to show that without a pre-existing illness, death would not have occurred. The defendant did not specifically produce such evidence, but whatever evidence it did produce was placed before the jury in the alembic of factual decision and, in the laboratory of their deliberation, the jury decided that no malady caused or contributed to Mrs. Brenneman's death." [5]

It is immaterial that in Brenneman the claim was that the accident was caused in whole or in part by the pre-existing infirmities, whereas in the instant case the claim is that the pre-existing infirmities were causative factors after the accident. As the court stated " * * * the burden shifted to the defendant insurance company to show that without a pre-existing illness *death* would not have occurred." (Emphasis supplied.) [6] Metropolitan attempts to distinguish Brenneman because "there * * * [was no] more evidence than mere speculation that the decedent's accident * * * was caused by a pre-existing and sub-

4. Pennsylvania no longer recognizes the distinction between accidental means and accidental results. Beckham v. Travelers Ins. Co., 1967, 424 Pa. 107, 225 A. 2d 532.

5. In a footnote the court cited Fazio v. Pittsburgh Rys. Co., 1936, 321 Pa. 7, at page 12, 182 A. 696, at page 698: "It is seldom, if ever, the duty of a litigant to prove a negative until his opponent has come forward to prove the opposing positive."

6. Cf. Weissman v. Prashker, 1961, 405 Pa. 226, 175 A.2d 63: "A defense based on an exception or exclusion in a policy is an affirmative one, and the burden is upon the insurer to establish it."

stantial infirmity." Whether the evidence is viewed in the light of the holding in Frame or in Brenneman, it was sufficient to create the issue whether the disability was caused by accidental means directly and independently of all other causes. It was conceded that the infection was septic. On cross-examination, Dr. Woldow testified that Lewin's coronary artery disease resulted in decreased blood circulation in the lower extremities; that in the past he had told Lewin to be careful not to get cuts or infection in his lower extremities because the decreased blood circulation "could" create a problem; that in general, infections are more difficult to control when a person has arteriosclerosis and diabetes mellitus; and that in general, decreased circulation cuts down on the amount of oxygen which is necessary to fight the infection. On redirect examination, however, and specifically with respect to Lewin, he testified:

"By Mr. Malis [Lewin's counsel]:

"Q. Now at the time that decision was reached, in your considered opinion, based upon your knowledge of the patient and his condition and the consultation with Dr. Stein, was the amputation determined to be necessary by reason of the infection alone as the sole and independent cause?

"A. [By Dr. Woldow]: Yes."

Dr. Sachs, a specialist in internal medicine, a member of the Vascular Section of the Department of Medicine of the University of Pennsylvania Hospital, and a member of the faculty of the University of Pennsylvania Medical School, testified on behalf of Lewin:

"In my opinion, that infection is entirely sufficient of and by itself to have resulted in a decision to amputate the leg. I can't say what the individual doctors had in their minds at the time they made this decision and what reasons were there for making it, but I would consider that a sufficient reason. So I think the infection was what made Mr. Lewin so rapidly ill.

"This was a rather precipitous course. Within a few days, he changed from a person able to attend a convention, make arrangements to meet his wife, to someone who was bedridden, toxic, with purulent drainage from his foot, infection in his leg, and shortly after facing the need which was decided upon for an amputation. I am satisfied that this rapid course of events was explained by the infection and that in my opinion this was sufficient reason, of itself, for the need for amputation."

On cross-examination, Dr. Sachs was unwilling to concede even in a general way that diabetes and coronary artery disease make an infection more difficult to overcome:

"Q. [By Mr. Leibold]: Well, when you say in itself contribute to an infection, we will agree with you Doctor, that bacteria causes the infection, but I am talking in terms of once the infection is there, curing the infection, isn't it true that it is much more difficult to cure the infection if someone has diabetes mellitus?

"A. I don't know that that is true. I know that this has been taught and I learned it when I was a medical student, but I am not at all convinced that the evidence in favor of that statement is really substantial. I think there may be other reasons why patients with diabetes have difficulty with infections, apart from the existence of the diabetes alone.

\*       \*       \*       \*       \*       \*

"Q. Doctor, isn't it your opinion that the occlusion of the popliteal artery and the major occlusive disease of Mr. Lewin seriously affected his ability to withstand any infection that he had in his right leg in June and July of 1960?

"A. I am not sure that the occlusion of the popliteal artery was particularly important in this situation. I think that if he had occlusions of arteries further down, particularly in the foot, they would have had more likely a

significant influence on the blood flow to those tissues which were involved in the injuries and subsequent infection and would have made it more difficult to heal.

"It is entirely possible for a patient to have a totally occluded popliteal artery and normal blood flow to the skin of the foot.

"Q. But you don't know that that occurred in this case do you?

"A. I don't have any information whatsoever about the status of the circulation in Mr. Lewin's foot, that is, before this injury.

"Q. Right. But you saw Mr. Lewin in 1964 and you know at that time that the circulation in his left leg was severely occluded?

"A. Yes, he had disease in his left leg and I think the circulation to the skin of the left foot was reduced."

\* \* \* \* \* \*

"By Mr. Malis: [Redirect Examination]

"Q. In cross-examination, Doctor, you discussed the possibility of the popliteal artery being occluded. Does this, in and of itself, necessarily indicate that the blood supply to the limb is insufficient?

"A. It does not necessarily indicate that the blood flow beyond the occlusion is insufficient; in fact, it doesn't even necessarily indicate that the blood flow below the limb to the skin of the foot is abnormal."

With similar testimony before it, the court in Kubacki v. Metropolitan Life Ins. Co., supra, said:

" \* \* \* The testimony of Dr. Sloan expressed his professional opinion that Kubacki died as the result of a cerebral hemorrhage independent of any other contributing cause. The value and weight of his testimony was for the jury. Certainly the members of this court cannot set themselves up as super experts in the field of medicine and announce as a matter of law that the evidence was insufficient to support the verdict."

■ We think this evidence, together with inferences reasonably drawn therefrom, justified submission to the jury of whether Lewin proved that the puncture and infection was the sole cause of his disability, independent of the diabetic and circulatory conditions.[7] In determining whether judgment n. o. v. should be awarded, the court should consider "only the question of law as to whether when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorably to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case. The rule has not withdrawn from the jury and given to the trial judge the exclusive power of the jury to weigh the evidence and to determine questions of fact." (Footnotes omitted.) Morris Bros. Lumber Co. v. Eakin, 3 Cir. 1959, 262 F.2d 259.

■ Finally, Metropolitan argues that Lewin did not sustain his burden of proving his alleged disability of 262 weeks. The district court did not assign this as a reason for the award of either the judgment n. o. v. or the new trial. Our independent review of the record convinces us that the evidence was sufficient. Lewin's leg was amputated in July 1960, after he had been in the hospital for about a month. He then suffered from a severe psychic disturbance caused by the amputation. After release from the hospital, he resided in various

7. In view of our holding, we need not consider Metropolitan's argument that Lewin failed to object to the court's charge on burden of proof, and failed to argue on post trial motion that the court's charge on burden of proof was incorrect. Nor do we consider whether Lewin's failure to preserve these matters would be reviewable as plain error despite such failure. Pritchard v. Liggett & Myers Tobacco Co., 3 Cir. 1965, 350 F.2d 479; Woods v. National Life & Accident Ins. Co., 3 Cir. 1965, 347 F.2d 760; Trent v. Atlantic City Elec. Co., 3 Cir. 1964, 334 F.2d 847; Mazer v. Lipschutz, 3 Cir. 1963, 327 F. 2d 42.

nursing homes and was in a nursing home at the time of the trial. He used a wheel chair. He testified that he had been in a weakened condition and not able to work. Dr. Woldow, testifying almost five years after the amputation, said that Lewin had been unable to work since the amputation.

■ Metropolitan attacks the testimony of Dr. Woldow because he did not testify to such details as the duties of Lewin as a candy salesman, whether he could perform any of them, or whether he could perform any other type of job. Metropolitan also argues Dr. Woldow did not give the reasons for his opinion. Dr. Woldow was a treating physician who had observed and treated plaintiff for many years. His opinion was not based on hypothetical facts. It was not necessary for him to detail these matters, but rather, the testing of his opinion was at the option of the cross-examiner. Roberts v. United States, 3 Cir. 1963, 316 F. 2d 489. There was more than sufficient evidence, viewed in its entirety, from which the jury could infer that Lewin was disabled within the meaning of the policies for the entire 262 week period.

■ The district court held in the alternative that a new trial should be granted because the verdict was against the evidence and the weight of the evidence. Such a motion is addressed to the sound discretion of the district court and the grant of a new trial should not be reversed unless, for example, it acted under the compulsion of a mistake of law or where it abuses its discretion. 6A Moore, Federal Practice para. 59.08 [5] (2d ed.).

The extent to which an appellate court should tamper with the views of the district court after it has awarded a new trial on the ground that the verdict is against the weight of the evidence was considered by this court in Lind v. Schenley Industries, Inc., 3 Cir. 1960, 278 F.2d 79. In that case the court pointed out the distinction between a new trial awarded because the verdict was against the weight of the evidence and one awarded for other reasons such as the

improper admission of evidence or prejudicial remarks. In the former instance, the evidence regularly went before the jury but the trial judge disagreed with its views; in the latter, the jury may have received a distorted or incomplete view of the operative facts or an undesirable element obtruded into the proceedings. The court said, in an opinion written by Chief Judge Biggs:

" * * * In the latter instance, * * * the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

"But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' rights to jury trial.

* * * * * *

"The subject matter of the litigation before us is simple and easily comprehended by any intelligent layman. The jury's main function was to determine the veracity of the witnesses: i. e. what testimony should be believed.

If Lind's testimony and that of Mrs. Kennan, Kaufman's secretary, was deemed credible, Lind presented a convincing, indeed an overwhelming case. We must conclude that the jury did believe this testimony and that the court below substituted its judgment for that of the jury on this issue and thereby abused its legal discretion."

Lind has been followed and applied in later decisions of this court and other courts of this circuit. Thompson v. Trent Maritime Co., Ltd., 3 Cir. 1965, 353 F.2d 632; Kuzma v. United States Rubber Co., 3 Cir. 1963, 323 F.2d 657; Fassbinder v. Pennsylvania R.R. Co., 3 Cir. 1963, 322 F.2d 859; Silverii v. Kramer, 3 Cir. 1963, 314 F.2d 407; Berguido v. Eastern Air Lines, Inc., E.D.Pa.1964, 35 F.R.D. 200; Marine Towing Co. v. Fairbanks, Morse & Co. E.D.Pa.1963, 225 F.Supp. 467.

■ We think the district court abused its discretion. While the court found there was no clear testimony from either Dr. Waldow or Dr. Sachs which excluded the effect of arteriosclerosis and diabetes mellitus, it noted that "Dr. Sachs stated that it was his opinion that there was no significant evidence connecting diabetes as a factor in precluding the healing of infections and that the occlusion of the popliteal artery probably had no effect in this case." The court's conclusion that "[h]owever, he was far removed from the actual event to know exactly how poor a condition Mr. Lewin's blood flow was in and was sufficiently impressed with his examination in September, 1964 to advise him to be extremely careful of infection" was a proper consideration for the jury in determining the credibility of Dr. Sachs. It is not a reason for a new trial. 6A Moore, Federal Practice para. 59.08 [5] at p. 3819 (2d ed.).

The court rejected the testimony of Dr. Woldow because it did not "either theoretically or practically, exclude the effect of previous diseases on the infection suffered by Mr. Lewin." We think that this does not properly credit the testimony of Dr. Woldow that the amputa-

tion was necessary "by reason of the infection alone as the sole and independent cause," and was motivated by the district court's conception of the "impossible burden" which it believed the Pennsylvania law placed on an insured. It did not give due consideration to the quality of the testimony which was similar to that found to be sufficient in Kubacki v. Metropolitan Life Ins. Co., supra.

The court also found that Lewin did not prove "satisfactorily that he had suffered an accident. Dr. Woldow could not find a puncture wound on the sole when he examined him on June 18, 1960, and the hospital reports do not mention this." Lewin testified that he stepped on a sharp object which caused a wound. Moreover, when he first contacted Dr. Woldow for *treatment*, he told Dr. Woldow that he had stepped on a sharp object and had cut his foot. While the evidence was conflicting, it was for the jury.

The judgment n. o. v. will be vacated, and the order granting a new trial will be reversed, with direction to the district court to enter judgment on the jury verdict.