**INTERNATIONAL FORWARDING CO.,** Plaintiff,

v.

**BISON FREIGHTWAYS, INC.,** Defendant, Third-Party Plaintiff,

v.

**ERIE–LACKAWANNA RAILWAY COMPANY,** Third-Party Defendant.

Civ. No. 9751.

United States District Court, M. D. Pennsylvania.

Aug. 21, 1970.

Joseph E. Gallagher, O'Malley, Morgan, Bour & Gallagher, Scranton, Pa., for plaintiff.

William J. Dempsey, Scranton, Pa., for defendant.

SHERIDAN, Chief Judge.

These are motions by plaintiff for a new trial, and for an inquiry into misconduct of the jury.

The action arises under the Interstate Commerce Act, 49 U.S.C.A. §§ 20(11) and 1013, for in-transit dam-

age to a color offset printing press. Miehle Company, Chicago, Illinois, the manufacturer, sold the press to Eureka Specialty Company, Inc., Scranton, Pennsylvania. Miehle turned it over to plaintiff, International Forwarding Co., for shipment. International is a freight forwarder with no transportation equipment of its own. It arranges for shipments to be carried by as many carriers as are necessary to deliver freight to its location. International, through intermediaries, delivered the press to Erie for transportation to Scranton. At Scranton, Erie turned it over to defendant, Bison Freightways, Inc., for delivery to Eureka. The delivery to Bison was pursuant to a contract between Bison and International. When the press was delivered to Eureka, it was found to have been damaged and International was obliged to pay Eureka $4,525.31 for damage.[1] International then sued Bison to recover this amount on the ground that the press was damaged while in the possession of Bison.[2]

Due to the large size of the press, it was shipped on six flat-bed trailers with staked sides. The parts were covered with a canvas tarpaulin and a waterproof wrapping paper underneath. The trailers were "piggybacked" on railroad flat cars to the Erie yard at Scranton. International's evidence showed that Bison went to Erie's yard to pick up the trailers; that Bison executed receipts for each flat car and there was no notation that any part of the shipment was damaged; that when the trailers were transported to Eureka and before they were unloaded, Eureka noticed that the tarpaulins on three of the shipments were torn and receipted for these shipments as damaged; that subsequent inspection showed that the only damage was to a printing unit on trailer GFT401471 which had apparently been hit or scraped against an object; and

that enroute to Eureka, Bison would have travelled under a railroad bridge.

Bison's principal witness was Michael Naro, an officer of Bison who also was one of those involved in moving the trailers from Erie to Eureka. Naro testified that the trailers had seven-foot sides and back doors with open tops over which a canvas was placed. When he arrived at Erie's yard, one trailer had been unloaded from the flat-bed railroad car, and the others were still on the railroad cars. He testified that as he approached the railroad cars from a distance, he noticed that several of the trailers still on the railroad cars had torn canvases and that he reported this to the freight agent[3] and other railroad employees who were engaged in unloading the cars. He did not notice any tear in the canvas on top of the unloaded trailer because its top was approximately twelve feet from the ground. When he delivered this trailer Eureka brought the tear in the canvas of this trailer to his attention. He testified that no bill of lading was presented to him and he signed the railroad receipt because Erie required it. He thought that by signing the receipt he was merely receipting for the trailer and not its contents, and this was in accordance with an Erie employee's instructions. He did not inspect the trailers or their contents more closely because a ladder was needed to climb to the top of the trailer, and its load, as the trailer sat on the ground.

Other evidence showed that the deck of the flat-bed trailer stood about three and one-half feet from the ground, and that the particular part of the press which was damaged was nine feet, three inches high. There was apparently no written contract between Bison and International but merely an oral agreement that Bison would pick up the trailers at Erie's yard and deliver them to

1. Payment was required under the Act.

2. At the conclusion of all the evidence, the court granted Erie's motion to dismiss the third party proceedings.

3. The freight agent died prior to trial.

Eureka. Mr. Schardon of International testified that Bison was designated as International's agent to complete the shipment.

The case was submitted to the jury on the theory that Bison would be liable to International if damage occurred while the trailers were in Bison's possession; and that if the jury found that Erie delivered the trailers to Bison and that Bison executed a receipt which did not contain any notation that the shipment was damaged, then International had made out a prima facie case for recovery unless Bison showed that it did not damage the shipment and satisfactorily explained why there was no notation of damage. There was no objection to the charge. The jury returned a verdict for Bison.

International contends that the verdict was against the weight of the evidence. It argues that the trailer which first had been unloaded from the railroad car was apparently the one which contained the damaged shipment; that Naro's explanation that he could not see the top of this shipment because it was too high was either a falsehood or in defiance of human experience because he admitted that he could see the tops of the shipments on the trailers still on the railroad cars which would even be higher than the top of the shipment on the unloaded trailer.

Naro's testimony was somewhat disjointed and unclear, and neither direct or cross-examination developed testimony specifically related to the damaged shipment. If we assume, as International does, that the trailer unloaded from the railroad car contained the damaged shipment, the jury might have inferred that Naro was standing next to the unloaded unit as he observed the units still on the railroad cars. His explanation for not seeing the damaged canvas on top of the unloaded unit, which would be about thirteen feet high, would then be credible. International's witness, Mr. Reardon, testified to the height of the units and that the top could not be seen if standing next to it; that a person would have to move to the side or climb up on it to see the top. There is no evidence that Naro's vantage point was the same for the unloaded unit as it was for the units still on the railroad car. The jury may have accepted Naro's testimony that he could not see the top of the unloaded unit, and simply inferred that the reason was that he was standing next to it.

It would seem, however, unimportant whether it was the unloaded unit or one of the units on the railroad car which sustained the damage. Bison delivered them all. Naro and his son picked up and delivered five of the trailers, and Ruddy, an employee of Bison, delivered the sixth. Naro and Ruddy testified that they did not hit or scrape the units against any object and that they would certainly know it if they did. Naro also testified that even though he noticed the ripped canvas on several of the units, he did not and would not have noted the damage in any case, because he thought his responsibility was limited to the condition of the trailers when he picked them up, and not the shipment. He testified that the trailers were sealed and this is borne out to some extent by testimony and the fact that a shipping order for one of the trailers refers to "seals," and perhaps he thought he had no responsibility for the contents of a sealed shipment. Whether he was legally correct in these interpretations is of no consequence; the important thing is that it was his explanation why he did not note the damage on the receipt. The jury simply may have believed that the canvas on several of the units was torn while still in the possession of Erie or prior parties; that the damage occurred when the canvas was torn; that Naro or Ruddy did not hit any object in delivering them; and accepted Naro's explanation that regardless of the condition of the canvas, he did not think that the shipment was his responsibility and, therefore, did not note the damage.

■ In this respect, this case is similar to Rhoades, Inc. v. United Air Lines, Inc., 3 Cir. 1965, 340 F.2d 481, in which

an airboat was damaged while being shipped from Los Angeles to Pittsburgh. Rhoades had arranged with United to transport the airboat but United was without facilities to transport the boat beyond Cleveland, Ohio. It, therefore, contracted with the Pennsylvania Railroad to complete the shipment. The airboat arrived at its destination in a damaged condition. Rhoades sued United which in turn sought recovery in a third party action against Pennsylvania on the theory that Pennsylvania made no notation of damage when it recovered the airboat from United. The court said:

"United's contention that the jury's finding in favor of Pennsylvania was against the weight of the evidence is also clearly without merit. Pennsylvania offered many witnesses who gave detailed evidence that when the airboat was received from United at Cleveland, it was damaged. The fact that such damage was not noted on Pennsylvania's records at the time of the airboat's receipt is, of course, evidential against Pennsylvania. United would lead us to believe, however, that such an omission on the part of Pennsylvania is conclusive as to its liability. As there conceivably are alternative reasons why Pennsylvania's records would be silent as to the damage, employee carelessness for one, such an omission cannot constitute evidence conclusive on the jury in this lawsuit. Pennsylvania's conduct in this respect was a factor to be weighed by the jury along with all the other evidence. That the jury found that the damage to the airboat occurred prior to its receipt by Pennsylvania was wholly within its province."

Naro may have made a mistake when he did not note the damage, a situation comparable to Rhoades where careless-ness may have played a part. Nevertheless, while Naro's failure to note the damage was evidence against Bison, his testimony that the canvas on some units showed damage, why he did not note it, and that he did not strike any object were for the jury. Under these circumstances, the court will not upset the verdict of the jury. Lewin v. Metropolitan Life Ins. Co., 3 Cir. 1968, 394 F. 2d 608.

International argues that the jury's verdict resulted from an unauthorized visit by two jurors to the underpass on the route travelled by Bison's driver; that these jurors reported to the other jurors that the load could not have scraped or hit the underpass; and that this report influenced the ultimate verdict of the jury. These allegations are supported by an affidavit of International's counsel who was approached by two jurors after the trial, and who gave this information to him. International moves the court to make inquiry into these allegations and if true, to award a new trial.

■■ Testimony of jurors will not be received to impeach their own verdict, unless it relates to extraneous influences brought to bear upon them. Orenberg v. Thecker, 1944, 79 U.S.App.D.C. 149, 143 F.2d 375; Lohr v. Tittle, 10 Cir. 1960, 275 F.2d 662. An unauthorized view is not an extraneous influence. Orenberg v. Thecker, supra; Lohr v. Tittle, supra. The reason for the rule is set forth in McDonald v. Pless, 1915, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 and quoted in length in the Orenberg and Lohr cases, and need not be repeated. Naro's testimony alone was sufficient to justify the verdict.

The motions for a new trial and for an inquiry of misconduct of the jury will be denied.