Kenneth CARPENTER and Betty Carpenter

v.

KOEHRING COMPANY

v.

BETHLEHEM STEEL CORP.

Civ. A. No. 73–417.

United States District Court, E. D. Pennsylvania.

March 21, 1975.

Joseph Lurie, Philadelphia, Pa., for plaintiffs.

Lynn L. Detweiler, Philadelphia, Pa., for Koehring Co.

William James O'Brien, Philadelphia, Pa., for Bethlehem Steel.

## OPINION AND ORDER

FOGEL, District Judge.

In this Section 402A products liability case, a jury awarded damages in the amount of $161,250 to plaintiff Ken-

neth Carpenter, and in the sum of $50,-000 to his wife, Betty. We are now asked by defendant Koehring Company to grant its motion for judgment n. o. v. or, in the alternative, its motion for a new trial.

Before us for decision are the following issues: (1) sufficiency of the evidence with respect to the existence of a defect in the accused machine; (2) the quantum of evidence of foreseeability required for a proper finding of proximate cause; (3) excessiveness of the award of damages to plaintiff's wife; and (4) existence of factors, if any, which would dictate the grant of a new trial, should the motion for judgment n. o. v. be denied.

The accident in question occurred on October 4, 1972, while plaintiff Kenneth Carpenter was assisting Clarence Horst and Thomas Padilione, both qualified mechanics, in the repair of a large earth-moving shovel. Mr. Carpenter's pants became caught in the nip-point—the contact point between two rotating drums—of a clutch set on the shovel. His leg was pulled through the drums, resulting in injuries which necessitated amputation from the knee down. This suit was brought by the injured plaintiff against the manufacturer of the equipment to recover monies over and above the workmen's compensation allowance he received from his employer, and by his wife for losses in her own right as a result of the injuries to her husband.

After the verdict, defendant moved for judgment n. o. v. on the same grounds originally advanced in support of its motion for a directed verdict. The motion for a new trial was based upon the following contentions, all in addition to those urged in support of the n. o. v. judgment: (1) the verdicts were against the law; (2) the verdicts were against the evidence; (3) the verdicts were against the weight of the evidence; (4) the verdicts were contrary to our instructions; (5) the verdicts were excessive; and (6) we erred in submitting special interrogatories to the jury in the manner in which we elected to do so.

Several of the grounds in support of the motions as originally filed were withdrawn by defendant at oral argument. Hence, the only n. o. v. and new trial issues now before us for disposition are as follows: (1) as a matter of law, did a 402A defect exist which justifies the verdict? (2) is the manufacturer responsible for the particular misuse of its product which is alleged to have caused the accident in the instant case? (3) is the award to the spouse so outrageous that it evidences bias by the jury, and therefore requires a new trial on the issue of damages to which she may be entitled? No complaint is lodged as to the amount of the award to Mr. Carpenter, provided we sustain the finding with respect to liability of Koehring to him. Moreover, because the trial was bifurcated, there is no contention that the amount of the damage awards demonstrates a prejudice by the jury in its findings with respect to liability, as the liability issues had been tried to a verdict first.

■ Before reaching the merits of the motions, it is helpful to pinpoint the standards which must be applied by a trial court in ruling upon them. To grant a motion for judgment n. o. v., we must find as a matter of law that the plaintiff failed to present facts which could justify the jury's verdict. Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1210 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). "[T]he motion for judgment n. o. v. may be granted only when, without weighing the credibility of the evidence, there·can be but one reasonable conclusion as to the proper judgment." 5A J. Moore, Federal Practice ¶ 50.07 [2], at 2356 (2d ed. rev. 1966).

■ A new trial motion calls upon the exercise of discretion by the trial judge, whose "duty is essentially to see that there is no miscarriage of justice." 6A J. Moore, Federal Practice ¶ 59.08 [5], at 59–160 (2d ed. rev. 1973). That discretion is not unbridled, however. Only if manifest injustice will result, can we vitiate the jury's verdict. We

may not substitute our own judgment for that of the jury, merely because we may have reached a different conclusion. Lewin v. Metropolitan Life Ins. Co., 394 F.2d 608, 614 (3d Cir. 1968), *quoting* Lind v. Schenley Indus. Inc., 278 F.2d 79, 90–91 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed. 2d 60 (1960).

## I. LIABILITY

### 1. *Motion for Judgment N.O.V.*

Plaintiffs claim that the defect was caused by the failure of the manufacturer to design and supply a guard over the nip point on the left-hand set of clutch drums. The accident, they allege, occurred as follows: a shaft broke on the shovel, which is known as the "505 Skooper"; the equipment had been manufactured by Koehring Company (Koehring), and was owned and operated by Bethlehem Steel Corporation (Bethlehem). Bethlehem sent two qualified mechanics, with Kenneth Carpenter as an assistant, to repair the Skooper, which was at the bottom of an open-pit mine. The work, which began at 7:00 A.M. and lasted throughout the entire day, involved removing the exterior cowling and various other pieces from the machine to gain access to two sets of clutch drums and the broken shaft beneath them. After removing the shaft with a chain hoist, a new shaft was installed, the clutch drums were replaced, the interior guard on the right nip point was replaced, and the two compression members—steel "I"-beams used to support the shovel—were set in place. The holes for pins to support the beams did not line up, so Horst and Padilione decided to start the Skooper's engine, and to use the hydraulic system to align the pieces. Immediately after the engine was started and the clutches were engaged, Carpenter moved forward because he understood that it was necessary for him to

help the mechanics with the placement of the pins. It was this action on his part that resulted in catching his pant leg in the left clutch set, for which no guard had been designed or supplied; his leg was then drawn into the clutches.

Viewing the evidence, as we must, most favorably to plaintiffs, we find that there was sufficient evidence to sustain the jury verdict. While design defects can present complex questions which lend themselves to subjective answers (*see* Henderson, Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication, 73 Colum.L.Rev. 1531 (1973)), such problems were not present in this case. The perforated guard was certainly a feasible addition, as evidenced by the presence of that kind of guard over the other nip point. The cost of such a guard is minimal, approximately Thirty-five Dollars, particularly when analyzed in light of the cost of the machine itself—Eighty-seven Thousand Dollars. The factors which govern the manufacturer's choice, therefore, were similar to those which are found in the usual tort case—foreseeability of exposure to the nip point on the left side, the type of personnel who may be exposed to the left nip point, the circumstances surrounding such anticipated exposure, and the probable effectiveness of the protective guard in preventing accidents such as the one which occurred in this case.

That the accident occurred during repairs to the Skooper, is not significant, in light of comment 1 to Restatement (Second), Torts § 402A (1965); the sweep of this section includes anticipated and foreseeable repairs of a product. We note that defendant at one point argued that comment 1 had not been expressly adopted by the Supreme Court of Pennsylvania. However, no case was cited by defendant in support of this proposition.[1]

1. Blaszczyk v. Hull Corp., CCH Prod.Liab. Rep. ¶ 6963 (C.P. Montgomery County, Pa. 1973), is dictum, because of the deliberate disregard of safety features on the machine. We consider Keystone Aeronautics Corp. v.

R. J. Enstrom Corp., 499 F.2d 146, 148 (3d Cir. 1974), to reflect the law in Pennsylvania more precisely, when, in speaking of a similar dispute over comment m, the court said that [t]he Supreme Court of Pennsylvania has

In the course of the trial, evidence was introduced which, if found credible, would have established the following: (1) the state of the art when the Skooper was designed and built was such as to make the manufacturer and the designers aware of the fact that all nip points should be covered, thus protecting personnel from possible exposure to them (T.R. 1–119 to 1–121); (2) the manufacturer has the responsibility and duty to provide safeguards for all machinery parts which may be exposed to contact with personnel charged with the performance of normal jobs involving operation and maintenance of machinery (stipulation, T.R. 1–146); (3) the exterior shroud was removed approximately twelve to twenty-five times yearly for work on the innards of the Skooper (T.R. 1–31, 1–36); (4) ·Bethlehem personnel were expected to make field repairs on the Skooper (T.R. 1–31, 1–50, 1–149, 1–150); (5) when the outer shroud was removed, the left side nip point was exposed, and the right side nip point was protected by a sheet metal guard (stipulation, T.R. 1–9, 1–116, 2–18); (6) the condition of the machine in question had not been altered by Bethlehem (stipulation, T.R. 1–7, 2–18); (7) the right side guard was replaced prior to starting the engine of the Skooper (T.R. 1–32); (8) if there had been a left side guard, it could have been replaced before the engine was started (T.R. 1–116, 1–143, 2–41); (9) a guard on the left side nip point would have prevented contact with that nip point (T.R. 2–20, 2–82); (10) one method of adjusting the position of the beams to line up the pin holes was to move the pieces with the Skooper's hydraulic system (T.R. 1–34); (11) operation of the hydraulic system, along with the performance of repair and maintenance work generally, often required that the engine of the Skooper be started before the outer cowling could be replaced (T.R. 1–39, 2–27, 2–40); (12) even the best-trained mechanic may have momentary lapses of concentration and attention (T.R. 1–139, 2–39, 2–87); (13) a nip point can inflict serious damage on any individual who becomes enmeshed in it (T.R. 1–121; also generally throughout transcript).

■■ As noted previously, we may not consider the credibility of the witnesses in ruling upon a motion for judgment n. o. v. Clearly, the evidence in this case supports the jury's finding that there was a defect in the design of the Skooper.

■■ Strict liability, however, under section 402A of the Restatement (Second) of Torts, requires more than the existence of a defect for liability to attach. The defect must be "unreasonably dangerous", and must also be the cause of the injury. Restatement (Second), Torts § 402A (1965). Items 8, 9, 12, and 13 listed above, together with the clear feasibility of the inclusion of a guard at small cost (under $35; T.R. 1–116, *passim*), are sufficient to support the jury's conclusion that the machinery as designed was "unreasonably dangerous". *See* Dorsey v. Yoder Co., 331 F.Supp. 753, 760 (E.D.Pa.1971), aff'd, 474 F.2d 1339 (3d Cir. 1973). The jury had complete instructions with respect to the factors which should be considered in arriving at such a conclusion (T.R. 4–81 to 4–83, 5–6 to 5–8, 5–9).

The issue of cause is more difficult. No one questions that the accident occurred when Mr. Carpenter's foot was caught in the nip point. The question, however, is whether Carpenter or his employer and fellow employees were so

tended to adopt other comments to this section of the Restatement, and we expect similar consideration of comment m.
*Id.* at 148. We have taken the same position with respect to comment 1, in the absence of any clear precedent either way.
The scope of the repairs involved also is not significant; comment 1 includes major and significant repairs on damaged equipment.

In Hoppe v. Midwest Conveyor Co., 485 F.2d 1196 (8th Cir. 1973), a pipefitter who was injured while trying to repair a damaged conveyor hoist was denied relief by the lower court. The appellate court reversed the directed verdict for the manufacturer, and sent the case back to the jury on a strict liability theory.

negligent that the defect was superseded by an intervening legal cause—the negligence of the third party defendant. This matter of causation was put to the jury in the form of special interrogatories.[2] The jury was asked (a) whether there was a defective condition, (b) whether the defective condition was a proximate cause of the injury, (c) whether the plaintiff assumed the risk, (d) whether the third-party defendant was negligent, and (e) whether this negligence was a proximate cause of the injury (T.R. 4–92 to 4–93). The jury found that the defect was a proximate cause of the injury and that Bethlehem was also negligent. The jury was told that *extraordinary* negligence on the part of Bethlehem was *not reasonably foreseeable* by Koehring, and that the Skooper *could not have been* in an unreasonably dangerous condition if the jury found negligence of that degree on the part of the third-party defendant (T.R. 4–88). The jury was instructed, therefore, on the basic questions of negligence and cause, and found explicitly that both defendant and third-party defendant were negligent. Implicitly, from its answer to the interrogatory addressed to the existence of a defect, the jury found that the third-party defendant was not *extraordinarily* negligent.

Koehring has made much of Carpenter's lack of familiarity with the 505 Skooper, and of the lighting conditions when the accident occurred. Its position is that as a matter of law, Bethlehem's conduct, by sending him to work on the Skooper under those conditions, was tantamount to extraordinary negligence. ▮ We do not agree that Bethlehem's decision to put Mr. Carpenter on the Skooper, tragic as it may have been, constituted extraordinary negligence. First, the evidence about lighting conditions did not unequivocally reveal the state of pitch darkness defendant would have us believed existed. The workmen had been communicating by hand signals moments before the accident (T.R. 1–45). Also, flashlights and lanterns were used to provide additional illumination (T.R. 1–45) because of the shadows (T.R. 1–76). It was not yet dark (T.R. 1–76). Finally, the job commenced early in the morning, and the operation was almost completed at the time of the accident, so that there had been ample opportunity for visual acclimatization to the situation.

Lack of familiarity with a particular machine does not dictate a finding of gross negligence and recklessness on the part of Bethlehem as a matter of law. In Hoppe v. Midwest Conveyor Co., 485 F.2d 1196 (8th Cir. 1973), the plaintiff, a pipefitter who was totally unfamiliar with the subject conveyor hoist, lost his foot when the machine retracted its hoist arms after he turned a pressure valve to unjam it. The directed verdict for defendant was reversed despite Hoppe's admitted lack of familiarity with the equipment.

Defendant has not come forward with any case which sustains the contention that a user who sends a person to aid in the repair of a complex machine, even though that employee is a stranger to that machinery, has committed such an extraordinary act of negligence as to preclude a finding against the manufacturer of the existence of an unreasonably dangerous defect as a matter of law. Bartkewich v. Billinger, 432 Pa.

---

2. The special interrogatories were as follows: 1. Did defendant Koehring Company sell a Skooper which, at the time of sale and upon reaching the user or consumer without a substantial change of condition, was in a *defective condition unreasonably dangerous* in the course of normal or foreseeable use, by virtue of defective design? (If answer to No. 1 is "no", do not answer any further interrogatories). 2. If the answer to No. 1 is "yes", was the defective condition a *proximate cause* of the plaintiff's injuries? (If the answer to No. 2 is "no", do not answer any further interrogatories. 3. If the answer to No. 1 and No. 2 are "yes", did plaintiff *assume the risk* created by such dangerous condition? 4. If the answer to No. 3 is "no", was third-party defendant Bethlehem Mines Corporation *negligent*, and if so, was said negligence a proximate cause of plaintiff's injury?

351, 247 A.2d 603 (1968), is not controlling because it deals with the voluntary act of a plaintiff who was well aware of the operation and dangers of a glass-breaking machine, and nevertheless put his hand into the opening of the crusher.

■ Nor is this a case of intervening negligence by the plaintiff himself. Blaszczyk v. Hull Corp., CCH Prod.Liab. Rep. ¶ 6963 (C.P. Montgomery County, Pa. 1973), which involved repairs on a molding press, is inapposite, because the plaintiff in that case deliberately, and with full knowledge of the danger, had another employee operate the remote start switch while he stayed on top of the machine to watch its operation. The remote switch was a safety device designed to prevent precisely this type of occurrence, and the voluntary overriding was a deliberate act which blocked plaintiff's recovery for damages. The evidence in this case does not square with the factual situations in the cases cited by defendant.

Defendant also cites Hendricks v. Pyramid Motor Freight Corp., 328 Pa. 570, 195 A. 907 (1936). Although it is not a products liability case, it does stand for the proposition that an extraordinary act of gross negligence and recklessness can be so unforeseeable that the concurrent negligence of defendant is not the proximate cause. The driver of a truck parked on a ferry drowned when the vehicle was pushed off the boat by the uncontrolled movement of a second truck, whose driver, in turn, had just put it in gear, without brakes, before the ferry reached the dock; all of these acts violated federal and state statutes and, indeed, ordinary common sense. Because of this extraordinary negligence, the ferry company was held not to be liable. The court also held that no proof existed to support the contention that the ferry company could have prevented the accident even if it had stronger guard cables, or if it had blocked the cars. The alleged negligence of the ferry company was based upon those two omissions.

To the contrary, in the case at bar, we are presented with a situation in which even the most careful workman could have been caught in the nip point; moreover, the addition of a guard, an inexpensive and feasible option, may have prevented the accident. The *Hendricks* teaching, therefore, is inapplicable to the facts of this case.

■ On the basis of the factual situation in the instant case, we are convinced that the verdict was justified. *See* Dorsey v. Yoder Co., *supra*, at 762, 764; W. Prosser, The Law of Torts § 37 (4th ed. 1971); Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 817, 838, 872 (1962).

### 2. *Motion for a New Trial*

■ Defendants have also moved for a new trial. Our role in reviewing such a motion is to act only when necessary to prevent a miscarriage of justice. We must be satisfied that the verdict was not influenced by bias or prejudice. *Lewin, supra,* at 614; *Lind, supra,* at 88–91. The credibility of witnesses is essentially a matter for the jury, and is to be respected by the judge, unless a serious miscarriage has occurred. The verdict is not to be set aside merely because the judge, had he or she been sitting as a juror, would have come to a different conclusion. 6A J. Moore, Federal Practice ¶ 59.08[5], at 59–159 (2d ed. rev. 1973).

The evidence as to a possible defect, the effectiveness and feasibility of a guard, the nature of the choice to use the machine's hydraulic power to move the compression members, and the factors which were considered by the manufacturer in determining whether to guard the nip points were presented by credible witnesses. Some of defendant's experts gave testimony which tended to buttress the case made out by plaintiffs. Plaintiffs' expert was found to be qualified, notwithstanding extensive and intensive questioning by counsel for defendant as to his experience. He was later subjected to additional painstaking

and pinpointed cross-examination. There is no doubt in our mind that a jury could reasonably decide as this one did. Hence there is no basis for granting a new trial.

## II. DAMAGES

Defendant's last objection is based upon the $50,000 verdict for Mrs. Carpenter. Defendant claims that the verdict is so far beyond the normal, and even the broad range of verdicts in this kind of case, that a new trial on the issue of damages to the spouse is necessitated. We have reexamined the record which was developed pertaining to the losses suffered by Mrs. Carpenter. There was testimony that Mrs. Carpenter took care of her husband after his release from the hospital (T.R. 6–71), that their social life had been sharply curtailed (T.R. 6–87, 6–88, 7–20), that prior to the accident Mr. Carpenter helped with cooking and assorted household tasks, but could not do so after the accident (T.R. 7–14), that this aid had been fifteen to twenty hours per week prior to the accident (T.R. 7–14), that after the accident he was moody, depressed, and "really changed" (T.R. 7–17 to 7–18), that now she had to wait on him "like waiting on a baby" (T.R. 7–18), and that she currently takes medicine daily as a result of the emotional strain his attitude and conduct cause her (T.R. 7–22 to 7–23).

The accident occurred when Mr. Carpenter was 45 years old. His wife was the same age. The trial occurred when plaintiff was 48 years old and had a life expectancy of 24.7 years (T.R. 7–101). Since his wife's life expectancy was slightly over 30 years, we may assume for the purposes of this opinion that they will have 24.7 more years of married life. The accountant who testified on behalf of the plaintiff at trial used a six per cent simple interest figure for calculating present value. Using his figures, we have independently determined what annual payment over the anticipated remainder of the Carpenters' marriage would yield a present value of $50,000 to Mrs. Carpenter. This

amount is $3,210.89 annually. Given the extent of the deprivation, the change in spirits of Mr. Carpenter, the nature of the duties thrust upon Mrs. Carpenter by her husband's injuries, and the anticipated duration of this situation, we cannot say that this verdict is arbitrary or capricious, or exceeds the outer limits for such an award.

Therefore, while subjectively, we may find the verdict to be on the high side, we cannot say, objectively, that it shocks our conscience, in view of the extent of the deprivation, disruption and loss of consortium which Mrs. Carpenter has suffered. Since the jury has not gone beyond the outer limits, there is no reason to require a new trial on this score. Defendant's motion, accordingly, will be denied. Draper v. Erie R. R., 285 F.2d 255 (3d Cir. 1960); Foresman v. Pepin, 71 F.Supp. 772, 775 (E.D.Pa.1946), aff'd, 161 F.2d 872 (3d Cir. 1947).

For the reasons cited, the verdict will be upheld.