Gladys E. ROGERS and Margaret Ann Rogers, as Co-Executrices of the Estate of Dilworth T. Rogers, Deceased, Plaintiffs,

v.

EXXON RESEARCH AND ENGINEERING COMPANY, a Delaware Corporation, Defendant.

Civ. A. No. 681–70.

United States District Court,
D. New Jersey.

Nov. 5, 1975.

**326**

Lowenstein, Sandler, Brochin, Kohl & Fisher by Murray D. Brochin, Charles R. Church, Newark, N. J., for plaintiffs.

Carpenter, Bennett & Morrissey by Thomas L. Morrissey, and Virginia D. Fenton, Newark, N. J., for defendant.

OPINION

STERN, District Judge.

This action brought under the Age Discrimination in Employment Act of 1967 (ADEA), Title 29 U.S.C. § 621 *et seq.*, was commenced as *Dr. Dilworth T. Rogers v. Esso Research and Engineering Company.* After his death, Dr. Rogers' wife and daughter were named co-executrices of his estate on June 11, 1973, and were substituted as plaintiffs. The caption was amended to reflect the defendant's corporate name change on June 14, 1974.

Trial with a jury was moved before this Court on January 14, 1975. There was no dispute that defendant Exxon had forced Dr. Rogers to take early retirement at the age of 60. The question was the reason for defendant's action. Plaintiffs maintained that Dr. Rogers was retired early because of his age, while defendant contended that Dr. Rogers was retired because of medical disability, principally caused by mental instability. The trial was bifurcated, and the jury returned a verdict on the issue of liability in favor of plaintiffs on January 31, 1975. Counsel stipulated plaintiffs' out-of-pocket compensatory damages at $30,000, and the subsequent trial on the issue of damages was limited to the question of damages for the pain and suffering inflicted on plaintiffs' decedent by the defendant's unlawful conduct. On February 4, 1975, the jury returned a verdict setting the amount of compensation for pain and suffering at $750,000. Judgment in the amount of $780,000 was entered in favor of plaintiffs on February 18, 1975.

On February 14, 1975, plaintiffs moved to fix the amount of attorneys' fees to be awarded them, and "to double the amount of damages as determined by stipulation of counsel and the verdict of the jury," pursuant to Title 29 U.S.C. §§ 626(b) and 216(b). After extensive briefing and argument of the issue, the latter part of the motion, which was in fact an application for liquidated dam-

ages, was granted with regard to the stipulated $30,000 out-of-pocket damages but denied with regard to the $750,000 damages for pain and suffering, on May 16, 1975.

On March 3, 1975, defendant moved for judgment of no cause of action notwithstanding the verdict, or in the alternative for a new trial. On May 16, 1975, the Court denied the motion for judgment notwithstanding the verdict, and denied the motion for a new trial on the condition that plaintiffs consent to a remittitur of $550,000. Plaintiffs consented to the remittitur by letter to the Court dated May 20, 1975. The Court awarded attorneys' fees, and the sum of $65,000 was fixed by consent of counsel on May 30, 1975.

This opinion deals with the Court's reasons for several of the rulings made in this case. The first section concerns the Court's finding that an action for compensatory damages for pain and suffering lies under this Act. In the second portion, the Court considers the attorneys' fees and liquidated damages provisions of the Age Discrimination in Employment Act, which incorporate certain sections of the Fair Labor Standards Act. Finally, the Court discusses the motions for judgment notwithstanding the verdict and for a new trial.

## I. COMPENSATORY DAMAGES FOR PAIN AND SUFFERING

After the jury returned its verdict on the issue of liability, the Court ruled that plaintiffs were entitled to demonstrate damages for pain and suffering inflicted on plaintiffs' decedent by the unlawful actions of defendant Exxon. (Tr. 1/31/74: 2111–2112) In the course of deciding the motion for liquidated damages, on May 16, 1975, the

Court reiterated that ruling. (Tr. 5/17/75: 32–33)

It is the Court's view that the ADEA essentially establishes a new statutory tort. Once liability is established under the statute, therefore, the panoply of usual tort remedies is available to recompense injured parties for all provable damages. As the Supreme Court held in the context of Title VIII of the Civil Rights Act of 1968, as amended, Title 42 U.S.C. § 3612, a statute proscribing racial discrimination in housing:

A damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach. As one Court of Appeals noted, this cause of action is analogous to a number of tort actions recognized at common law.

*Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974) (footnote omitted.) [1] The Supreme Court has also held that other civil rights statutes "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Pierson v. Ray*, 386 U.S. 547, 556, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (Title 42 U.S.C. § 1983); *cf. Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1143 (4th Cir. 1975) (Title 42 U.S.C. § 1982). *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238–240, 90 S. Ct. 400, 24 L.Ed.2d 386 (1969) (Title 42 U.S.C. §§ 1981–1982), *and Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Title 42 U.S.C. § 2000e *et seq.*).

---

1. The Court observed in a footnote:

An action to redress racial discrimination may also be likened to an action for defamation or intentional infliction of mental distress. Indeed, the contours of the latter tort are still developing, and it has been suggested that "under the logic of the common law development of a law of insult and indignity, racial discrimination might be treated as a dignitary tort." C. Gregory and H. Kalven, Cases and Materials on Torts 961 (2nd ed. 1969).

415 U.S. at 195–196, n. 10, 94 S.Ct. at 1009.

■ It is well-established that "the existence of a statutory right implies the existence of all necessary and appropriate remedies." *Sullivan v. Little Hunting Park, Inc., supra,* 396 U.S. at 239, 90 S.Ct. at 405. The Court held in *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946):

> [W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

(footnotes omitted)

The Age Discrimination in Employment Act of 1967 may profitably be compared with Title VII of the Civil Rights Act of 1964, in both purpose and scope. As the Court observed in *Hodgson v. First Federal Savings & Loan Ass'n,* 455 F.2d 818, 820 (5th Cir. 1972), "[w]ith a few minor exceptions the prohibitions of this enactment are in terms identical to those of Title VII of the Civil Rights Act of 1964 except that 'age' has been substituted for 'race, color, religion, sex or national origin.'" (footnote omitted) *Accord, Laugesen v. Anaconda Co.,* 510 F.2d 307, 311 (6th Cir. 1975). *See, e. g., Hodgson v. Tamiami Trail Tours,* 4 EPD ¶ 7795 (S.D. Fla.1972). Thus "analogies to Title VII cases are often helpful in age discrimination cases." *Schulz v. Hickok Manufacturing Co., Inc.,* 358 F.Supp. 1208, 1212, n. 2 (N.D.Ga.1973). *See* 113 Cong.Rec. 34742 (90th Cong., 1st Sess.) (remarks of Rep. Matsunaga); Levien, "The Age Discrimination in Employment Act: Statutory Requirements and Recent Developments," 13 *Duq.L.Rev.* 227, 247 (1974). In its most recent analysis of Title VII remedies, the Supreme Court held that Congress intended for that statute "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 418, 95 S.Ct. at 2372. The Court continued:

> Title VII deals with legal injuries of an economic character occasioned by racial or other anti-minority discrimination. . . . Where racial discrimination is concerned, "the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154 [85 S.Ct. 817, 822, 13 L.Ed.2d 709]. And where a legal injury is of an economic character,
>
> > "[t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed as near as may be, in the situation he would have occupied if the wrong had not been committed." *Wicker v. Hoppock,* 6 Wall. 94, at 99 [18 L.Ed. 752]
>
> The "make whole" purpose of Title VII is made evident by the legislative history. . . .

*Id.*

The cases which have examined the purpose and legislative history of the ADEA, although relatively few, agree that the Act shares Title VII's "make whole" purpose.

■ In *Brennan v. Paragon Employment Agency, Inc.,* 356 F.Supp. 286, 288 (S.D.N.Y.1973), *aff'd mem.,* 489 F.2d 752 (2d Cir. 1974), Judge Knapp wrote:

> The Act was intended to alleviate the serious economic *and psychological* suffering of people between the ages of 40 and 65 caused by wide-spread job discrimination against them. See §§ 621, 631 of the Act, 1967 U.S. Code

Cong. & Admin.News, p. 2213, Cong. Rec. Nov. 6, Dec. 4, 1967.

(Emphasis added)

It is important to note, as the Eighth Circuit has recognized, that the ADEA's remedial purpose should be liberally effectuated by the district court in fashioning appropriate relief:

> We note that the Age Discrimination in Employment Act of 1967 is remedial in nature. *See* 29 U.S.C. § 621; 1967 U.S. Code Cong. & Admin. News p. 2214. It prohibits a particularly subtle form of discrimination, and the courts must be receptive to its purposes and accord it the intended scope.

*Surrisi v. Conwed Corp.*, 510 F.2d 1088, 1090 (8th Cir. 1975). *Cf. Blankenship v. Ralston Purina Co.*, 62 F.R.D. 35, 38 (N.D.Ga.1973); *Woodford v. Kinney Shoe Corp.*, 369 F.Supp. 911 (N.D.Ga. 1973).

■ In measuring the wrong done and ascertaining the appropriate remedy here, the Court is aware that the most pernicious effect of age discrimination is not to the pocketbook, but to the victim's self-respect. As in this case, the out-of-pocket loss occasioned by such discrimination is often negligible in comparison to the physiological and psychological damage caused by the employer's unlawful conduct. Various factors may combine to mitigate the victim's out-of-pocket loss. The older worker may have been contributing to a pension fund during his many years of employment, and may receive benefits when he retires. The worker who is illegally discharged because of his age is often a capable and productive employee; indeed, Congress' recognition of this fact is the foundation of the statute. Such a worker may well succeed in the difficult task of finding new employment, which, though perhaps not equal to what was lost, may reduce his out-of-pocket compensatory award still further.

■ In the instant case, for example, there was testimony that plaintiffs' de-cedent was a scientist and inventor of recognized merit, and the developer of 51 patents. (Tr. 268–269) He lived for approximately three and one-half years after his forced retirement from defendant's employ. Despite his professional standing and the several additional years he could have worked at Exxon, however, Dr. Rogers' stipulated out-of-pocket loss was only $30,000, because of certain pension benefits claimed by Exxon and acknowledged by plaintiffs as legitimate set-offs.

The record of this case amply demonstrates that the real loss Dr. Rogers suffered lay elsewhere. It is difficult enough for anyone to encounter and to surmount the psychological and physiological problems of the aging process. Simultaneously to find oneself arbitrarily discharged because the clock has struck a certain hour adds substantially, as the evidence demonstrated here, to these already formidable stresses. The cumulative effect of an arbitrary and illegal termination of a useful and productive older employee is a cruel blow to the dignity and self-respect of one who has devoted his life to productive work, and can take a dramatic toll.

Dr. Rogers was the holder of Bachelor and Master of Science degrees from the Rensselaer Polytechnic Institute, and another Master's degree and a Ph.D. degree from Harvard University. He may fairly be termed a leader in his field, having served as president of both the Rensselaer Polytechnic Institute Association of Chemists and Chemical Engineers and of the Harvard Association of Chemists. His civic activities also included service as alumni advisor to Rensselaer Polytechnic Institute, and as an officer of the Loyalty Fund committees at Trinity College and Duke University. He was the first employee to attain the position of Senior Research Associate in the Products Research Division of defendant Exxon (Tr. 245), and from time to time traveled to various universities to recruit new technical personnel on the company's behalf. (Tr. 88–93)

Dr. Rogers had been employed by defendant Exxon, except for a one-year lapse, since 1938. The jury found, and the evidence supports its finding, that Dr. Rogers was unlawfully terminated because of his age. Such conduct by an employer toward an older worker has predictable consequences in terms of the victim's physical and emotional well-being. Dr. Rogers, for example, experienced a syndrome of severe abdominal pain, vomiting and impotency, all of which were clearly and persuasively demonstrated by the medical and lay testimony in this case to have been the proximate result of defendant's illegal discrimination.[2] This damage, of course, is wholly uncompensated by the stipulated out-of-pocket award. It can be compensated only by permitting the award of damages for pain and suffering. Such an award is not punitive in purpose, but is designed solely to effect full and adequate compensation for all injuries sustained as a result of the unlawful and tortious conduct. The specific question of the relief available under the statute is, of course, within the equitable discretion of the district court. *Brennan v. Ace Hardware Corp.*, 495 F. 2d 368, 373 (8th Cir. 1974). A thorough examination of the legislative history confirms the Court's view that the Congressional purpose mandates an award of compensatory damages for pain and suffering, upon an appropriate factual showing.[3]

2. According to the testimony of Dr. Diefendorf, Dr. Rogers' personal physician, plaintiffs' decedent suffered from the following work-related physical conditions caused by nervous disturbance: indigestion, heartburn, bloating, nausea, insomnia, lightheadedness, lack of ambition, fatigue, depression, impotency, and an itching skin rash called cholinergic urticaria, a type of hives. (Tr. 2169–2171) On at least one occasion, Dr. Diefendorf prescribed five milligrams of Valium, a mild tranquilizer, to be taken three times a day. (Tr. 2171), Dr. Rogers was also apparently afraid to drive because of "his feelings of uncertainty," (Tr. 2169), and his distrust of the dependability of his own reactions. (Tr. 2173) Dr. Diefendorf testified that Dr. Rogers' physical symptoms worsened when his work situation deteriorated. (Tr. 2173) Similarly, certain symptoms ameliorated after his retirement. For example, on March 28, 1969, Dr. Rogers' pulse rate was measured at 120 (Tr. 2179), a factor which "is often a sign of tension and anxiety." (Tr. 2173) That rate "quieted" to 84 in November 1969, two months after the official involuntary retirement and more than seven months after Dr. Rogers' last day of work, March 7, 1969. (Tr. 2179) Dr. Diefendorf testified that Dr. Rogers' symptoms were "a classical picture of an anxiety reaction or a nervous disturbance . . ." (Tr. 2181–2182)

3. The purpose of the ADEA was summarized in the remarks of Senators Javits and Young (Ohio) during that body's debate on the bill:
Senator Javits:
Mr. President, it is a sad day indeed when a man realizes that the world has begun to pass him by . . . . But it is surely a much greater tragedy for a man to be told, arbitrarily, that the world has passed him by, merely because he was born in a certain year or earlier, when he still has the mental and physical capacity to participate in it as energetically and vigorously as anyone else.

113 Cong. Rec. 31254 (1967).

Senator Young:
I long have felt it is a particular tragedy to amputate a human being's function, to strip productive persons of their skills, cheating them of the dignity of continued self-support. These are the consequences of forced retirement. It squeezes useful, healthy people out of the mainstream of society into a drab tributary on its fringe. *Id.*, at 31256.

As pointed out by several members during the House debate, the Act was designed to protect older workers from more than the purely economic effects of job discrimination on the basis of age. President Johnson recognized, in recommending the ADEA to the Congress in his Older American message of January 23, 1967, that "the greater loss is the cruel sacrifice in happiness and well-being which joblessness imposes on these citizens and their families." 113 Cong.Rec. 34744 (remarks of Rep. Kelly). Congress was clearly aware of the paradox of modern medicine's extension of the human life span and modern industry's relegation of those newly-found years to depressing inactivity, rather than productive and meaningful work. *See* 113 Cong.Rec. 34744 (remarks of Rep. Pucinski).

The suitability of compensatory awards for pain and suffering has been recognized in other discrimination contexts, although the Court has found no reported case authorizing such an award under the Age Discrimination in Employment Act of 1967.

The full scope of the evil against which Congress sought to legislate was aptly stated by Rep. Eilberg during the House debate:

> Barred from productive work because of age discrimination, many people are forced to retire at the earliest possible moment, usually at substantially reduced retirement incomes. Suffering over increasingly longer periods of life with smaller pensions is a tragedy which need not happen, if early retirees had opportunities for employment open to them on the basis of their capabilities, rather than closed on account of their age.
>
> The financial and social costs, of course, are nothing compared with the costs in terms of human suffering and welfare which come about as the result of discriminatory practices in employment because of age. Employment plays a very important role in the makeup of the modern American and this role cannot be measured in the dollars he carries home on payday. Self-esteem, self-satisfaction, and personal security are important by-products of employment in industrial America. To deny a person the opportunity to compete for jobs because of unfounded age prejudice, is a most vicious, cruel, and disastrous form of inhumanity.
>
> The bill before the House is, of course, no panacea. By itself, this legislation cannot compel men to change their attitudes or ignore their prejudices. But this piece of legislation will help to focus attention upon a very serious problem. At the same time, the bill contains very real and effective tools with which to launch new educational and persuasive programs designed to eradicate discriminatory practices in employment. And, where these tools fail, the bill provides machinery to enable governments and agencies to prevent practices which cannot be otherwise overturned. The success, or failure, of this legislation will, in the end, depend upon coordinated efforts by Government, employers, unions, educational institutions, and private interested agencies and parties.

113 Cong.Rec. at 34745.

In his remarks Rep. Pepper made reference to a report of the American Medical Association, which found that although "[i]t is difficult to prove that physical or mental illness can be directly caused by denial of employment opportunities . . . few physi-

In *Humphrey v. Southwestern Portland Cement Co.,* 369 F.Supp. 832, 833–835 (W.D.Tex.1973), *rev'd on other grounds,* 488 F.2d 691 (5th Cir. 1974), *rehearing denied,* 490 F.2d 992 (5th Cir. 1974), the Court awarded $1200 in damages for "psychic injuries" under Title

cians deny that such a relationship exists." 113 Cong.Rec. at 34751.

Immediately before the House overwhelmingly passed the bill which became the ADEA, Rep. Dwyer identified the psychological ills the statute would combat:

> Men and women who, through no fault of their own, find themselves out of work and over 40 have been the forgotten people of our time. They have been victims of the myth that holds they are too settled, too hard to retrain, and have too little time left to make valuable contributions to new employers. The facts are otherwise, however, and it is up to Congress to help relieve the anxieties that beset millions of the middle-aged and eliminate the obstacles that stand in the way of full opportunity for all.
>
> When a man or woman of 55, for instance, loses his job, he faces the prospect of long months of *frustration, fear,* and *insecurity* as he searches for a new one. And the odds are heavily against his finding new employment similar in kind and pay to his former position—no matter how skilled and experienced and vigorous he may be. The cost of such an experience in terms of *mental anguish,* family *suffering,* lost income, and damaged self-respect is too high to measure. One must observe it at firsthand—as I am confident many of our colleagues have—to appreciate how *painful* and how unnecessary it all is.
>
> . . . [W]hen older applicants are, in fact, more capable and dependable . . . or when retraining and the acquisition of new skills is feasible . . . then job discrimination hurts not only the deprived applicants but the employers and our economy and society as well.
>
> This is especially true when discrimination consists of the blunt, blind refusal, rigid and unbending, to employ workers once they have passed an arbitrary age, however able or qualified they may be. As we have seen, such a closed-door policy only adds to long-term unemployment, higher relief costs, and *extensive human suffering and despair.*

113 Cong.Rec. at 34751–34752. (Emphasis added)

VII. The Court held "that the purpose of the Act will best be served if all of the injuries which are caused by discrimination are entitled to recognition." 369 F.Supp. at 835. Once a plaintiff has established unlawful discrimination, "the remedies available . . . should be effective and complete." *Id.*

The *Humphrey* court persuasively summarized the characteristics of discrimination which require the availability of damages for mental distress to provide complete relief to an injured plaintiff:

> Evidence of mental distress was received. That distress is not unknown when discrimination has occurred. See, for example, *Chance v. Frank's Beauty Salon*, 35 A.D.2d 304, 316 N.Y.S.2d 236 (1970) noted in 35 Albany L.Rev. 782 (1970); *Massachusetts Commission Against Discrimination v. Franzaroli*, 357 Mass. 112, 256 N.E.2d 311 (1970) noted in 49 N.C.L.Rev. 221 (1970), and *Commission on Human Rights v. Knox Realty Co.*, 56 Misc.2d 806, 290 N.Y.S.2d 633 (1968). But as the trial progressed it became more apparent that the psychic harm which might accompany an act of discrimination might be greater than would first appear. For the loss of a job because of discrimination means more than the loss of just a wage. It means the loss of a chance to learn. Discrimination is a vicious act. It may destroy hope and any trace of self-respect. That, and not the loss of pay, is perhaps the injury which is felt the most and the one which is the greatest.

369 F.Supp. at 834.

Several courts of appeals have found compensatory damages for emotional distress and humiliation an appropriate remedy for discrimination in housing in violation of Title 42 U.S.C. §§ 3604, 3612 and 1982. *Williams v. Matthews Co.*, 499 F.2d 819, 829 (8th Cir. 1974), *cert. denied* 419 U.S. 1021, 1027, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119 (7th Cir. 1974); *Seaton v. Sky Realty*

*Co., Inc.*, 491 F.2d 634, 636 (7th Cir. 1974); *Steele v. Title Realty Co.*, 478 F.2d 380, 384 (10th Cir. 1973); *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344 (7th Cir. 1970). District courts in those circuits and elsewhere have concurred. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 367 F.Supp. 860, 864 (D.Md.1973) (on remand from United States Supreme Court), *rev'd on other grounds*, 517 F.2d 1141, *rehearing denied,* 517 F.2d 1154 (4th Cir. 1975); *Hughes v. Dyer*, 378 F.Supp. 1305, 1310 (W.D.Mo.1974); *Gonzales v. Fairfax-Brewster School, Inc.*, 363 F.Supp. 1200, 1205 (E.D.Va.1973) (§ 1981—private school segregation). *See, e. g., Rhoads v. Horvat*, 270 F.Supp. 307 (D.Colo. 1967); *Sexton v. Gibbs*, 327 F.Supp. 134 (N.D.Tex.1970), *aff'd* 446 F.2d 904 (5th Cir. 1971) (§ 1983—suits for illegal arrest); *Donovan v. Reinbold*, 433 F.2d 738 (9th Cir. 1970) (§ 1983—suit for intentional tort of dismissal from public employment for exercise of first amendment rights); *Richardson v. Communications Workers of America*, 443 F.2d 974 (8th Cir. 1971) (union's discrimination against non-union employee).

The availability of compensatory damages for pain and suffering finds further support in the literature. *See* Comment, "Implying Punitive Damages in Employment Discrimination Cases," 9 *Harv.Civ.Rights-Civ.Lib.L.Rev.* 325, 367–369 (1974); Duda, "Damages for Mental Suffering in Discrimination Cases," 15 *Clev.-Mar.L.Rev.* 1 (1966). *See also* Note, "Age Discrimination in Employment: The Problem of the Worker Over Sixty-Five," 5 *Rutgers-Camden L. J.* 484, 493 (1974).

Such damages have also been awarded by several state courts in appropriate discrimination cases. *See, e. g., Zahorian v. Russell Fitt Real Estate Agency*, 62 N.J. 399, 412–416, 301 A.2d 754, 762 (1973), and the New York, Massachusetts and Oregon cases cited therein. Resort to both state and federal law for remedies for the violation of federal rights has been expressly approved by the Supreme Court:

Compensatory damages for deprivation of a federal right are governed by federal standards, as provided by Congress in 42 U.S.C. § 1988 . . . .

This means, as we read § 1988, that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes. Cf. *Brazier v. Cherry,* [5 Cir.] 293 F.2d 401. The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired.

*Sullivan v. Little Hunting Park, Inc., supra,* 396 U.S. at 239–240, 90 S.Ct. at 406 (1969).

Those authorities which have rejected the award of compensatory damages for pain and suffering in discrimination cases have ruled solely on statutory grounds inapplicable to the ADEA. For example, such awards have been denied in Title VII cases on the theory that relief under that statute is limited to "equitable relief in the form of restitution," and that damages for pain and suffering are accordingly foreclosed. *Bradshaw v. Zoological Society,* 10 FEP Cases 1268 (S.D.Cal.1975), citing *EEOC v. Detroit Edison,* 515 F.2d 301 (6th Cir. 1975). *Accord, Jiron v. Sperry-Rand Corp.,* 10 FEP Cases, 730, 739 (D.Utah 1975). *See* Comment, "Developments in the Law: Employment Discrimination and Title VII of the Civil Rights Act of 1964," 84 *Harv.L.Rev.* 1109, 1259–1261 (1971).

Title VII is distinguishable from the ADEA in this regard, and the Court is not limited to equitable remedies under this Act. Title 29 U.S.C. §§ 626(b) and (c) provide that the district court may grant "such legal or equitable relief as will effectuate the purposes of this chapter." Section 626(b) continues with an enumeration of various types of appropriate relief, in which damages for pain and suffering are not included. However, Congress expressly provided that its enumeration of remedies was not exclusive, with the language "including without limitation." *Cf. Curtis v. Loether, supra,* 415 U.S. at 197, 94 S.Ct. 1005, a discussion of the distinction between the action for damages authorized by the Fair Housing Act, as amended in 1968, and the equitable relief authorized by Title VII, as amended in 1972.

In summary, it is the opinion of the Court that the ADEA creates a statutory tort, and empowers the Court to employ a wide range of legal and equitable remedies in the exercise of the broad remedial discretion normally associated with actions arising from intentional torts. The Congressional history and cases decided under this and analogous civil rights statutes clearly contemplate redress of the emotional and psychological injury proved in this case by the relief awarded by the jury. The verdict of the jury, as remitted by plaintiffs on the motion for a new trial, will stand.

## II. LIQUIDATED DAMAGES

Title 29 U.S.C. § 626(b) provides as follows:

(b) The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of this title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or

promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

■ It is clear from this section that the ADEA incorporates the cited enforcement provisions of the Fair Labor Standards Act, here particularly Title 29 U.S.C. § 216(b).⁴ *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 287–289 (5th Cir. 1975); *Hodgson v. First Federal Savings & Loan, supra*, at 820; *Brennan v. Ace Hardware Corp., supra*, at 373–374; *Monroe v. Penn-Dixie Cement Corp.*, 335 F.Supp. 231, 234–235 (N.D. Ga.1971). Therefore, "a reasonable attorney's fee" must be awarded plaintiffs. *Brennan v. Ace Hardware Corp., supra; Schulz v. Hickok Manufacturing Co., Inc., supra*, at 1217; *Monroe v. Penn-Dixie Cement Corp., supra*, at 235–236. The Court is aware of the contrary view expressed without explanation in *Stringfellow v. Monsanto Co.*, 320 F.Supp. 1175, 1181 (W.D.Ark.1970), but feels compelled to reject it. Since the award of attorney's

fees is specifically authorized by § 216(b), the Supreme Court's recent decision in *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) is no bar to that award here. *Alyeska Pipeline, supra*, at 257–258 and n. 33, 95 S. Ct. 1612.

■■ In addition, "amounts owing" as a result of a violation of the ADEA are subject to an equal award of liquidated damages, under § 216(b), provided that the violation was "willful." The issue of willfulness is for the Court and not the jury, and after the Court indicated its view in that regard, counsel so stipulated at trial. (Tr. 2112–2114; Tr. 5/16/75: 29–30) *See Chilton v. National Cash Register Co.*, 370 F.Supp. 660, 666 (S.D.Ohio 1974). The definition of "willful" to be applied in this context was aptly stated by Judge Middlebrooks in a Fair Labor Standards Act case:

> [T]he term "willful" . . . must be construed in the civil sense. It therefore applies to violations which are intentional, knowing or "voluntary as distinguished from accidental and it is used to characterize conduct marked by careless disregard whether or not one has the right so to act. *United States v. Illinois Central Ry. Co.*, 303 U.S. 239, 243 [58 S.Ct. 533, 82 L.Ed. 773] [(1938)]

4. Title 29 U.S.C. § 216(b) provides as follows:

(b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection.

*Hodgson v. Hyatt,* 318 F.Supp. 390, 392–393 (N.D.Fla.1970).

■■■ The Court will not engage in a detailed analysis of the testimony in this opinion. The Court's own impressions of the. testimony of Drs. Hakala and Caldwell of defendant Exxon, as well as of the self-serving memoranda evidently prepared by Dr. Caldwell in anticipation of litigation, but admitted into evidence without objection, lead clearly to the conclusion of willfully illegal conduct by that corporation under this or any other standard of "willfulness" with which this Court is familiar. The testimony of Mrs. Rogers regarding her conversations with Dr. Caldwell, and the testimony corroborating plaintiffs' allegations of Exxon's scheme to rid itself of older workers, beginning before and continuing after the effective date of the Act, amply support the award of liquidated damages for willful violation of the ADEA. By its verdict on liability and damages, the jury found plaintiffs' witnesses credible; the Court can reach no other conclusion than that defendant's illegal conduct was willful within the meaning of § 626(b).

■■■ It is the Court's view, however, that "amounts owing" under the ADEA refers only to out-of-pocket pecuniary loss, represented in this case by the $30,000 stipulated damages. In *Monroe v. Penn-Dixie Cement Corp.,* supra, Chief Judge Smith observed:

> Although the Act speaks in terms of recovery of "unpaid minimum wages or unpaid overtime compensation," if the court determines that an aggrieved person suffered a pecuniary loss because of a violation of the Act, it is agreed the court should order the violator to repay such loss and for the purposes of the Act, any amount so paid will be deemed to be "minimum wages or unpaid overtime compensation."* See Halgren, Age Discrimination in Employment Act of 1967, 43 L.A.B.Bull, 361, 364 (1968).

335 F.Supp. at 234–235, n. 3.

This Court agrees that the liquidated damages provision is best construed as limited to "pecuniary loss." In incorporating the provisions of the Fair Labor Standards Act into the ADEA, Congress obviously intended to provide for analogous treatment of the analogous elements of unpaid minimum wages/overtime compensation, in the FLSA context, and out-of-pocket loss in the case of the ADEA. In either situation, those wages and benefits the employee has lost because of the statutory violation are effectively doubled by the provision for liquidated damages. This additional award "is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945).

For these reasons, the Court awarded an additional $30,000 liquidated damages in the instant case, but denied the application for liquidated damages with regard to the jury award of damages for pain and suffering.

III. MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR A NEW TRIAL.

*A. Judgment n. o. v.*

Defendant moved for judgment notwithstanding the verdict, and .in the alternative for a new trial, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. Defendant was entitled to move for judgment n. o. v., having moved for a directed verdict both after the plaintiff's case and at the close of all the evidence.

■■■ The standard of proof on such a motion is like that for a motion for a directed verdict. Indeed, it has been uniformly held that a motion for judgment n. o. v. "may not be granted unless as a matter of law it is found that [plaintiff] failed to present a case for

the jury, and a verdict in [defendant's] favor should have been directed at the end of the trial." *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3rd Cir.) (Adams, J.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed. 2d 55 (1970). The appropriate test is whether, when the evidence is viewed most favorably to the non-moving party and all reasonable inferences are drawn in its favor, the court determines that there is not sufficient evidence upon which the jury could properly have found for the non-moving party. 9 Wright & Miller, *Federal Practice and Procedure* § 2524 (1971).

As the Third Circuit held in *Lewin v. Metropolitan Life Insurance Co.*, 394 F. 2d 608, 613 (1968), citing *Morris Bros. Lumber Co. v. Eakin,* 262 F.2d 259 (3rd Cir. 1959) (Maris, J.):

> In determining whether judgment n. o. v. should be awarded, the court should consider "only the question of law as to whether when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorably to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case. The rule has not withdrawn from the jury and given to the trial judge the exclusive power of the jury to weigh the evidence and to determine questions of fact."

The Third Circuit has stated the standard of sufficiency of evidence to present an issue for the jury:

> . . . and if the evidence is of such character that reasonable men, in an impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury.

*Silverii v. Kramer,* 314 F.2d 407, 409 (3rd Cir. 1963).

■ Under these tests, it is clear that the Court may not grant judgment notwithstanding the verdict in favor of defendant, either on the issue of liability or on the issue of damages. The Court finds the evidence of illegal conduct and of pain and suffering clear and compelling, and the motion for judgment n. o. v. has accordingly been denied.

### B. *New Trial*

■ Once a motion for judgment n. o. v. is denied, an alternative motion for a new trial is to be considered as if it has been made independently, pursuant to Rule 59 of the Federal Rules of Civil Procedure. Such a motion is "addressed to the sound discretion of the district court." *Grove v. Dun & Bradstreet, Inc.,* 438 F.2d 433, 438 (3rd Cir. 1971). The difference between the standards of proof for a motion for judgment n. o. v. and for a motion for a new trial was set out by the Eighth Circuit in *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 186 (8th Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973), quoting *Simpson v. Skelly Oil Co.,* 371 F.2d 563, 566–567 (8th Cir. 1967), where the Court held:

> There is a difference in the function of a judge when he is ruling on a motion for a directed verdict or a judgment n. o. v. and when he passes on a motion for a new trial. . . .

> In the former instance, it is his duty to accept the plaintiff's version as true for the purposes of the motion, notwithstanding the existence of strong testimony to the contrary; the judge is not concerned with the weight of the evidence. On the motion for new trial, however, he has wider, *though not unlimited,* latitude and he may set the verdict aside where it is against the weight of the evidence, or to prevent injustice.

(Emphasis in *Fireman's Fund*)

Defendant Exxon asserted two grounds for the granting of a new trial: (1) that the verdict of liability was against the weight of the evidence, and (2) that the verdict of damages for pain and suffering was excessive.

In *Lind v. Schenley Industries, Inc.*, 278 F.2d 79 (3rd Cir. 1960 [en banc]) (Biggs, C. J.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), the Court distinguished between a motion for a new trial based upon a claim that the verdict was against the weight of the evidence, and such a motion based on claimed errors or other defects during the trial, "which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or . . . creat[ed] a condition whereby the giving of a just verdict was rendered difficult or impossible." 278 F.2d at 90. It is clearly the former which is at issue here. The Court continued:

> But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny . . . in order to protect the litigants' right to jury trial.

*Id.*

 Where a trial is long, complicated and remote from the ordinary juror's experience, as in patent cases, the trial court should look more closely at the verdict than it permissibly may where the issues are essentially of credibility. *Lind, supra,* at 91. *See Hourston v. Harvlan, Inc.,* 457 F.2d 1105, 1107 (3rd Cir. 1972); *Grove v. Dun & Bradstreet, supra.* In the instant case, the issue of liability resolved into one of credibility of the witnesses, and this Court will not intrude upon the jury's function in that area. In addition, the Court cannot say it has been "left with the definite and firm conviction that a mistake has been committed," and therefore grant a new trial on the basis of a verdict against the weight of the evidence. 11 Wright & Miller, *Federal Practice and Procedure* § 2806 (1973). *See Carpenter v. Koehring Co.,* 391 F. Supp. 206, 208–209 (E.D.Pa.1975). In *Gebhardt v. Wilson Freight Forwarding Co.,* 348 F.2d 129, 133 (3rd Cir. 1965), the Court of Appeals elaborated this standard:

> If the evidence in the record, viewed from the standpoint of the successful party, is sufficient to support the jury verdict, a new trial is not warranted merely because the jury could have reached a different result. . . . Neither the trial court nor this Court may substitute its judgment for that of the jury on disputed issues of fact.

Only if this Court found the jury mistaken and its verdict clearly wrong, although supported by some evidence, could a new trial conceivably be granted. *See Jackson v. Baldwin-Lima-Hamilton Corp.,* 252 F.Supp. 529, 537 (E.D.Pa.), *aff'd* (3rd Cir.), *cert. denied,* 385 U.S. 803, 87 S.Ct. 189, 17 L.Ed.2d 117 (1966). The Court cannot make such a finding here.

 Defendant's position is considerably stronger, however, with regard to its claim that the $750,000 award of damages by the jury was excessive. The applicable standard is whether the Court finds the jury's award "shocking, unfair or biased." *Frankel v. Heym,* 466 F.2d 1226 (3rd Cir. 1972) (Hastie, J.). The following district court formulation of the appropriate test was affirmed by the Third Circuit:

> Damages assessed by a jury are not to be set aside unless shocking to the judicial conscience or so grossly inadequate as to constitute a miscarriage of justice . . . or unless the jury's award indicates caprice or mistake or

**338**

a clear abuse of its fact-finding discretion or the clear influence of partiality, corruption, passion, prejudice, or a misconception of the law. [citations omitted] The trial judge should be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff.

*Tann v. Service Distributors, Inc.*, 56 F. R.D. 593, 598 (E.D.Pa.1972) (Becker, J.), *aff'd*, 481 F.2d 1399 (3rd Cir. 1973).

The Court has found the size of the damage award in this case to be unfair to defendant, though not the product of corruption, prejudice or misconception of law. It is the Court's view that the verdict, albeit excessive, manifested the jury's outrage at defendant's conduct and its desire to award the maximum permissible recovery to plaintiffs. Accordingly, the Court has denied the motion for a new trial on the condition that plaintiffs remit $550,000 of the jury's award. *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Such a remittitur reduces the award to the maximum amount, in the Court's opinion, that the jury could permissibly have awarded. *United States v. 1160.96 acres of land*, 432 F.2d 910, 913–914 (5th Cir. 1970); *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1047 (5th Cir. 1970). *See Bonura v. Sea-Land Service Inc.*, 512 F.2d 671, 672 (5th Cir. 1975) (dissenting opinion of Goldberg, J.).

■ Before the instant case went to the jury on the issue of damages, plaintiffs' counsel asked the Court's permission to suggest the figure of $200,000 as the appropriate recompense for the pain and suffering of plaintiffs' decedent. (Tr. 5/16/75: 34–35) The request was denied. After a careful and independent review of the evidence, this Court has concluded that that figure represents the maximum verdict the jury could permissibly have awarded. The Court's conclusion is not based solely on plaintiffs' view of the proper award, as evidenced by counsel's request, but principally on the Court's own review of the medical testimony and exhibits, as well as the other evidence adduced at trial.

Defendant also sought a new trial on the basis of certain prejudical errors alleged to have been committed by the Court at trial. These matters are preserved for possible review, and the Court finds no reason to disturb its prior rulings.

By consent of counsel, interest on the judgment of $260,000 in plaintiffs' favor will run from May 27, 1975. (Tr. 5/16/75: 42–45) Costs will be taxed against defendant.

Counsel for plaintiffs will submit an appropriate form of judgment in the amount of $260,000 plus interest and $65,000 for attorneys' fees, within ten (10) days hereof, with the consent of counsel for defendant to its form endorsed thereon.